J-S60009-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| T.S.N., | |
| Appellant | No. 3187 EDA 2014 |

Appeal from the Judgment of Sentence Entered October 20, 2014
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0001030-2013

BEFORE:  BENDER, P.J.E., LAZARUS, J., and OTT, J.

MEMORANDUM BY BENDER, P.J.E.:                **FILED NOVEMBER 02, 2015**

Appellant, T.S.N.,[1] appeals from the judgment of sentence of an aggregate term of 8 to 16 years' incarceration, imposed after he was convicted of two counts each of involuntary deviate sexual intercourse (IDSI) and aggravated indecent assault (AIA), as well as one count of corruption of minors (COM).  Appellant contends that the trial court abused its discretion by admitting certain evidence, and by denying Appellant's motion for a mistrial when the Commonwealth made improper comments in

---

[1] Because this is a sexual assault case involving a minor victim who shares the same last name as Appellant, we will use Appellant's initials to protect the victim's identity.  We have also redacted from the trial court's opinion Appellant's name, the victim's birthdate, and the names of the victim's mother and father.

its closing argument. He also maintains that the jury's verdict was contrary to the weight of the evidence. After careful review, we affirm.

The trial court briefly summarized the facts of this case, as follows:

On November 12, 2012, a Criminal Complaint was filed based on allegations that [Appellant], [T.S.N.], sexually assaulted his fourteen year-old half-brother.[2] The incident came to the attention of law enforcement after the Victim, his mother and his father appeared at the Chester-Crozer Medical Center (CCMC) on October 29, 2012. The Victim's mother reported her suspicion that her son had been assaulted by his older half-brother. A sexual assault examination was performed at the hospital and hospital personnel reported the incident to the City of Chester Police Department.

Trial Court Opinion (TCO), 3/13/15, at 1.

A four-day long jury trial was conducted in July of 2014, at the close of which Appellant was convicted of IDSI by forcible compulsion, where the victim was less than 16 years old; IDSI of an unconscious person, where the victim was less than 16 years old; AIA without consent, where the victim is less than 16 years old; AIA of an unconscious person, where the victim was less than 16 years old; and COM. After the verdict, Appellant's counsel orally moved for extraordinary relief under Pa.R.Crim.P. 704(B), which the trial court denied. *See* N.T. Trial, 7/18/14, at 147-148.

On October 20, 2014, the court conducted Appellant's sentencing hearing. At the start thereof, Appellant renewed his oral motion for extraordinary relief, arguing that the jury's verdicts were contrary to the

_____

[2] Appellant was 18 years old at the time of the offenses.

weight of the evidence. *See* N.T. Sentencing, 10/20/14, at 8-12. Again, the court denied Appellant's motion. *Id.* at 12. The court then imposed an aggregate sentence of 8 to 16 years' incarceration. Appellant filed a timely notice of appeal, and also timely complied with the court's order to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal. Herein, Appellant presents three issues for our review:

> I) Whether the court erred in allowing the admission of testimony by the victim's parents and Officer John Kuryan regarding an alleged prior contact of a presumably sexual nature between Appellant and the victim that supposedly occurred years before the incident in question where the prior allegation lacked foundation and therefore lacked any probative value whatsoever and served only to raise speculation in the mind of the jury to the prejudice of Appellant[?]

> II) Whether the court erred in failing to grant a defense motion for [a] mistrial based on remarks made by the prosecutor during his closing argument with respect to character traits of a sexual assault victim which served only to prejudice the jury to the extent that their verdict was based on something other than the evidence presented[?]

> III) Whether the court erred in denying Appellant's motion for extraordinary relief presented in the form of a claim that the verdicts were against the weight of the evidence which was raised orally at the sentencing hearing held in this matter[?]

Appellant's Brief at 7-8 (unnecessary capitalization omitted).

We have reviewed the briefs of the parties, the certified record, and the applicable law. Additionally, we have reviewed the thorough and well-crafted opinion of the Honorable James P. Bradley of the Court of Common Pleas of Delaware County. We conclude that Judge Bradley's extensive opinion accurately disposes of Appellant's second and third issues on

appeal.[3]  Therefore, regarding those two issues, we adopt Judge Bradley's opinion as our own.[4]

Judge Bradley's opinion also provides a detailed and accurate assessment of Appellant's first issue, in which he contends that the court erred by admitting evidence of a prior incident of sexual assault between Appellant and the victim.  **See** TCO at 16-19.  However, we add a brief discussion of Appellant's argument that the prior bad act evidence lacked sufficient foundation to be admissible.  Appellant's Brief at 18.  In support of

---

[3] We note that in Appellant's second issue, he challenges two comments made by the prosecutor during his closing argument.  The trial court sufficiently addresses one of those comments (in which the prosecutor remarked that "this is the way a real sex assault victim acts[,]"), essentially concluding that it was harmless error.  **See** TCO at 25-27; N.T. Trial, 7/18/14, at 58.  On appeal, however, Appellant also takes issue with the prosecutor's reference to "the reactions of the 'realistic' teenage boy." Appellant's Brief at 36; **see also** N.T. Trial, 7/18/14, at 51 (prosecutor's stating, "that is a realistic way that when a teenage boy gets raped by another boy, that's the way the disclosure would come out…").  While the trial court does not specifically discuss this comment, we conclude that the court's harmless error analysis applies with equal force to the 'realistic teenage boy' comment, and the combined impact of the two challenged remarks did not prejudice Appellant to the extent that the jurors had a "fixed bias and hostility toward [Appellant], thus impeding their ability to weigh the evidence objectively and render a true verdict."  **Commonwealth v. Judy**, 978 A.2d 1015, 1020 (Pa. Super. 2009) (stating that "prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict").

[4] We note that Appellant raised two additional issues in his Rule 1925(b) statement that he has abandoned herein.  Thus, we do not adopt the trial court's discussion of those issues in its opinion.  **See** TCO at 19-24.

this claim, Appellant relies on **Commonwealth v. Washington**, 573 A.2d 1123 (Pa. Super. 1990), arguing that that case "stands for the proposition that, first and foremost, before a 'prior bad act' will be deemed probative for purposes of weighing the evidence against its prejudicial effect, the conduct alleged must be *prima facie* established by competent proof that it actually occurred." Appellant's Brief at 18.

Assuming, *arguendo*, that Appellant's characterization of **Washington**'s holding is correct, we disagree that the Commonwealth failed to proffer *prima facie* proof of the prior incident of abuse between Appellant and the victim. During the victim's trial testimony, he indicated that this was the second time Appellant assaulted him in this same manner. N.T. Trial, 7/15/14, at 188. The victim explained that a prior incident with Appellant occurred when the victim was approximately 10 years old.[5] **Id.** at 188-190. During that encounter, Appellant got on top of the victim while he slept, but got off when the boys' father walked in. **Id.** at 190. The boys' father corroborated the victim's testimony, stating at trial that he walked in when the prior act of abuse was occurring and saw Appellant "on top of" the victim. N.T. Trial, 7/16/14, at 125-126. While the father was hesitant to

---

[5] We note that the trial court states that the prior sexual assault occurred two years before the present assault. **See** TCO at 18. However, the record indicates the assaults occurred four years apart. **See** N.T. Trial, 7/15/14, at 189 (the victim stating the past incident occurred when he was "[a]round the age of 10" and the present assault happened when he was 14 years old).

elaborate on what, specifically, Appellant was doing to the victim, the father did testify that what he saw "caused [him] concern[,]" and he removed the victim from the room with Appellant. *Id.* at 126. The family did not allow Appellant to be alone with the victim for years after. *Id.* at 152. The Commonwealth also presented evidence that the victim told police officers that during the prior incident of abuse, Appellant "had touched him," and "put it in [the victim's] butt." *Id.* at 286. Additionally, the victim told the sexual assault nurse who examined him after Appellant's current assault that Appellant "has touched him inappropriately in his butt before." *Id.* at 229.

We conclude that the victim's statements to police and the sexual assault nurse, along with the testimony of the victim and his father at trial, was sufficient *prima facie* evidence that a prior incident of abuse occurred between Appellant and the victim. Accordingly, Appellant's claim that this prior bad act evidence was inadmissible because it lacked foundation is meritless. As for Appellant's other assertions regarding the probative value of this evidence, its prejudicial impact, and the remoteness of the prior incident and the current assault, we conclude that the trial court sufficiently addresses those claims in its opinion.

In sum, based on the rationale expressed herein, and the analysis provided by the trial court in its opinion, we conclude that Appellant's three issues are meritless and affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: <u>11/2/2015</u>

**IN THE COURT OF COMMON PLEAS OF DELAWARE COUNTY, PENNSYLVANIA
CRIMINAL DIVISION**

| | |
|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** : | **CP-23-CR-1030-2013** |
| : | |
| **vs.** : | |
| : | |
| ~~LAMAR NEAL~~ : | |
| T.S.N. : | |

**Ryan Grace, Esquire, on behalf of the Commonwealth
Patrick J. Connors, Esquire, on behalf of the Defendant**

## O P I N I O N

**Bradley, J.**                    **FILED:** 3/13/15

On November 12, 2012 a Criminal Complaint was filed based on allegations that the Defendant, ~~Lamar Neal~~ T.S.N. sexually assaulted his fourteen year-old half-brother. The incident came to the attention of law enforcement after the Victim, his mother and his father appeared at the Chester-Crozer Medical Center (CCMC) on October 29, 2012. The Victim's mother reported her suspicion that her son had been assaulted by his older half-brother. A sexual assault examination was performed at the hospital and hospital personnel reported the incident to the City of Chester Police Department.

After a preliminary hearing Defendant was held for court and was charged in a thirteen count Information with various offenses in connection with this incident. In May of 2013 trial counsel filed a Notice of Alibi Defense, an omnibus pre-trial motion and a motion to compel

1



discovery. On June 7, 2013 he entered his appearance and[1] a series of additional pre-trial motions were filed. On June 14, 2013 fifteen pre-trial motions were filed including *inter alia*, motions to quash and to dismiss based on allegations that the Victim was incompetent, a motion to suppress the Victim's statements based on allegations that the Victim was a habitual liar and therefore unreliable, a motion to compel a psychiatric evaluation of the Victim, motions to exclude "prejudicial terms" at trial, to exclude testimony regarding "behavioral indicators," "victim profile evidence," a motion to compel an interview with an unnamed expert witness, and a motion to order to compel law enforcement to video-tape interviews of the Victim and of witnesses. On June 20, 2013 additional motions were filed including, *inter alia*, another motion to compel the Victim to be interviewed by an unnamed expert witness, a motion to suppress the Victim's prior statements based on their inherent unreliability, a motion to exclude all "uncorroborated" and/or "unsubstantiated" hearsay of any state witness and a motion to preclude John Kuryan, an investigating police officer, and Emily Donahee, a Children and Youth Services caseworker, from testifying as "experts" regarding their interviews of the alleged victim. Later, in July of 2013 additional motions including a *motion in limine* that set forth a litany of boilerplate requests, the majority of which were either not pertinent to the matter before the court or which included general allegations concerning evidentiary matters that are routinely ruled on at trial were filed.

On July 13, 2013 the Court addressed the outstanding motions[2]. The vast majority were denied without prejudice and trial counsel was directed to raise an objection during trial

---

[1] Defendant was represented by Arik T. Ben-Ari, Esquire at his preliminary hearing. Trial counsel Andrew J. Edelberg, Esquire entered his appearance on June 7, 2013 after filing the initial pre-trial motions.

[2] The Court's rulings were memorialized in twenty-one Orders that were entered on August 1, 2013.

should such an objection become appropriate as the trial proceeded. Additional repetitious motions followed, and eventually, on July 15, 2014, the trial commenced with jury selection.

After four days, on July 18, 2014 Defendant's jury trial concluded. The jury returned guilty verdicts on the following charges: involuntary deviate sexual intercourse by forcible compulsion where the victim is less than sixteen years old[3], involuntary deviate sexual intercourse of an unconscious person where the victim is less than sixteen years old[4], aggravated indecent assault without consent where the victim is less than sixteen years old[5], aggravated indecent assault of an unconscious person where the victim is less than sixteen years old[6] and corruption of minors[7].

Trial counsel immediately made an oral motion for extraordinary relief pursuant to Rule 704. This motion was denied and on July 25, 2014 trial counsel filed "Defendant, ███████ ███████ Application for Leave to Argue Oral Motion for Extraordinary Relief." Essentially this motion raised a challenge to the weight of the evidence and cited several allegations of trial court error and sought a release on bail pending appeal. This motion was dismissed on August 1, 2014 following which trial counsel moved to withdraw his appearance. On October 20, 2014 an aggregate sentence of eight to sixteen years of incarceration to be followed by five years of probation was imposed.

Following sentencing, on October 21, 2014 trial counsel's motion to withdraw his appearance was granted. The Court ordered a stay of all proceedings for twenty days to allow Defendant the opportunity to obtain new counsel and directed the Office of the Public

---

[3] 18 Pa.C.S.A. § 3123(a)(1)
[4] 18 Pa.C.S.A. § 3123(a)(3)
[5] 18 Pa.C.S.A. § 3125(a)(1)
[6] 18 Pa.C.S.A. § 3125(a)(4)
[7] 18 Pa.C.S.A. § 6301(a)(1)(i)

3

Defender of Delaware County to interview him within forty-eight hours so that his qualifications for representation by that Office could be determined. The Office of the Public Defender was ordered to notify the court of its determination.

The Office of the Public Defender, on behalf of the Defendant, filed a timely Notice of Appeal on November 18, 2014. Appellate counsel was ordered to file a Concise Statement of Errors on Appeal and after an extension was allowed to enable new counsel time in which to comply, on February 6, 2015 Defendant's "Statement of Matters Complained of on Appeal," was filed.

Defendant raises the following complaints on appeal:

1) The trial court erred when it allowed testimony from Officer John Kuryan and the Victim's parents regarding prior sexual contact between the Defendant and the Victim where the alleged contact was remote in time , lacked  probative value and unduly prejudiced the Defendant;

2) The Court erred when it excluded the testimony of crime scene detective Ernest Minercha. Detective Minercha's testimony was probative in that Defendant attempted to establish "that the investigation of the incident in question was entirely mishandled," and had direct bearing on the defense's ability to challenge the weight of the Commonwealth's evidence before the jury;

3) The trial court erred by failing to grant the Defendant's motion for a mistrial based on comments of the prosecutor during closing argument regarding the "character traits of a sexual assault victim";

4) The trial court erred by failing to grant a *motion in limine* "to exclude the testimony of the victim and all out-of-court statements made by the victim where the testimony and statements were the direct result of unduly suggestive interviews conducted by Officer John Kuryan and CYS Worker Emily Donahee,"

5) The trial court erred by refusing to allow Defendant "the opportunity to present the testimony of two DNA experts regarding the significance of the fact that," analysis of material secured from the scene was inconclusive regarding identity; and

6) The trial court erred when it denied Defendant's oral motion for extraordinary relief which challenged the weight of the evidence.

### Weight of the Evidence

Addressing first Defendant's challenge to the weight of the evidence supporting the verdict, although the Defendant did not file post-sentence motions, upon the jury's return of the verdict trial counsel orally renewed his motion for judgment of acquittal. See N.T. 7/18/14 p. 147. This motion was denied and before sentencing, on October 20, 2014 trial counsel again orally challenged the weight of the evidence. See N.T. 10/20/14 pp. 8-12. Pennsylvania Rule of Criminal Procedure 607(A) provides that a claim that a verdict is against the weight of the evidence must be raised before the trial court and recognizes an oral motion made before sentencing, as a sufficient method to place the matter before the trial court, thus preserving the issue for review on appeal. See Pa.R.Crim.P. 607; 720(B)(1)(c).

If the court determines that a verdict is against the weight of the evidence, a defendant will be awarded a new trial. See Commonwealth v. Widmer, 744 A.2d 745, 751 (Pa. 2000). A motion for new trial on the grounds that the verdict is contrary to the weight of the evidence, concedes that there is sufficient evidence to sustain the verdict and therefore, the trial court is under no obligation to view the evidence in the light most favorable to the verdict winner. See Commonwealth v. Clay, 64 A.3d 1049, 1054-55 (Pa. 2013).          A motion for a new trial based on a claim that the verdict is against the weight of the evidence

5

is addressed to the discretion of the trial court. See Commonwealth v. Widmer, 744 A.2d at 751–52; Commonwealth v. Brown, 648 A.2d 1177, 1189 (Pa. 1994). A new trial should not be granted because of a mere conflict in the testimony or because the judge on the same facts would have arrived at a different conclusion. Commonwealth v. Widmer, 744 A.2d at 752. The role of the trial judge is to determine whether, notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice. Commonwealth v. Clay, supra. "[A] new trial should be awarded when the jury's verdict is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail." Commonwealth v. Clay, 64 A.3d at 1054-55. In reviewing a claim that the verdict is against the weight of the evidence the court does not sit as the thirteenth juror. A trial judge must do more than reassess the credibility of the witnesses and allege that he would not have assented to the verdict if he were a juror. See Commonwealth v. Widmer supra.

The Victim in this matter is the younger half–brother of the Defendant. The brothers are four years apart in age and they share a father. The Victim lives with his mother, ███████ ("Mother") ███████ and his maternal grandmother. During the relevant time period the Defendant lived with his paternal Grandmother. The boys' father, ███████████ ("Father"), lived in Chester with his girlfriend and her children. Defendant was a frequent visitor to this home and it was in this home that the incident that gave rise to these charges occurred.

In October of 2012 ███████ [Mother] gave the Victim permission to visit his father at the home ███████ [Father] shared with his girlfriend. N.T. 7/16/14 pp. 149-152. At the time, the Victim was fourteen years old. ███████ [Mother] testified that normally she did not allow the Victim to

6

spend time with his father because she did not allow her son to be near the Defendant. Id. at 152. **Mother's** [redacted] prohibition arose after an incident occurred years earlier when the Victim and the Defendant were at their paternal grandmother's home. At that time the Defendant and the Victim were together visiting their father **Father** [redacted]. **Father** [redacted] was out and when he returned after a night of drinking he found the Defendant "on top of" the Victim. N.T. 7/16/14 pp. 124-26. **Father** [redacted] told the Defendant to "get off my son," and took the Victim upstairs to sleep with him. Id. He told his then-girlfriend not to leave the boys alone and reported the incident to **mother** [redacted]. Id. at 124-26; 151.

At trial the Victim testified that he had a "good" relationship with the Defendant and that he "looked up to him." See N.T. 7/15/14 pp. 172-175. In October of 2012 his mother allowed him to visit his father at **Father's** [redacted] home. The Victim was at the home on Friday night, October 26th talking and spending time with **Father** [redacted]. Id. at 178. **Father** [redacted] went out for the evening and later, when **Father** [redacted] was still out, the Defendant arrived. Id. at 178-180. The brothers talked and played video games in the living room for a couple of hours. The Victim went upstairs and took some medication. He returned to the living room and fell asleep on the smaller of two sofas that are in the room. The Defendant was on the larger sofa. Id. at 182.

A sharp pain from behind him, near his "ass" woke the Victim from his sleep. Id. at 183. His basketball shorts were down around his knees. Id. at 186. The Defendant was the only other person in the room and the Victim pulled up his pants and asked, "an angry what are you doing." Id. at 187-88. The two fought. Ms. Anderson heard the commotion and came

from the second floor down into the living room and asked about what was going on. Id. at 187-91. The Victim did not tell Ms. Anderson that the Defendant had assaulted him. Id. at 191. When asked why he did not tell Ms. Anderson the Victim explained: "Because as in like the little kid who wanted to be like his brother, I – even though we're here today, even though I'm testifying against my brother, I still love my brother. He's family. But justice has to be served, please…. I thought I could get over it and just let it go but I couldn't. Id. at 191-92.

Father
██████ returned to the residence the next morning and the Defendant left that morning. Id. at pp. 86-90. On Sunday morning the Victim had an argument with his father. Id. at 193. His maternal grandmother retrieved him and brought him home to his mother. Id. at 192; N.T. 7/16/14 pp. 155-56. ██████████, the Victim's mother, testified that when the
Mother
Victim arrived at home he was "hysterical." N.T. 7/16/15 p. 185. ██████ calmed the Victim down and they went to a football game. Id. at 57. That evening the Victim ate dinner, had a bath and went to bed. Id. at 158.

Mother
On Monday, the next morning, ██████████ was doing the family laundry. When putting clothes in the washer she looked at the underwear that the Victim wore the previous day and saw that "[t]here was blood all over the drawers." Id. at 158. She woke the Victim up and asked him about the underwear, which appeared to have blood stains on the back. Id. at 160.
Mother                                    Father
The Victim said, he didn't know where the blood came from and ██████ called ██████,
Father
██ and told him about what she had found. ██████ said that he knew nothing about it. ██.
Mother          Father
██████ informed ██████ that she was taking the Victim to the hospital and that she would
Mother
be picking him up en route. Id. at 161. During the drive to the hospital ██████ repeatedly

8

asked the Victim about what had happened. The Victim would not answer and provided no details concerning what had happened at his father's house, but only cried during the trip. Id.

At CCMC Cindy McAlinney, a registered nurse, forensic nurse examiner and sexual assault nurse examiner, conducted an examination. N.T. 7/16/14 pp. 212-215. She reviewed information that was provided by the Victim's mother and father and began her examination by interviewing the Victim. Id. at 227. The Victim reported that "he was asleep and nothing happened." Id. at 229. He told her that he had diarrhea and that was what was in his underwear. Id. Ms. McAlinney observed that the Victim was "oriented," but sleepy, tired and "very quiet" and that he was saying that nothing happened. Id. at 231, 248. She conducted a physical examination and observed that there was redness around the opening of his anus and that there was a tear that measured about a half centimeter. Id. at 232-33, 257. Ms. McAlinney testified that the tear and redness could be consistent with blunt force trauma. Id. at 234. She acknowledged on cross-examination that she could not say what caused the tear or how long it had been there. Id. at 258. Anal and oral swabs were also taken in the course of the physical exam. Id. at 235, 266.

The samples procured were submitted to the Pennsylvania State Police Laboratory for DNA testing and analysis. The results of the testing were entered into evidence by way of stipulation. The relevant facts stipulated to follow. Blood-stained underwear and rectal swabs that were taken from the Victim and a known DNA sample of the Defendant were submitted to the PSP DNA laboratory. Lauren Force, a known forensic DNA scientist who is qualified in the field as an expert in forensic DNA analysis attempted a comparison between the known DNA sample and the blood-stained underwear. Test results were inconclusive. Carolyn Oleyar,

9

a forensic scientist and a qualified expert in serology who is employed by the PSP Harrisburg Serology Unit, examined the rectal swabs. No hair or skin was found. Sperm was found. Ms. Force attempted a DNA comparison between the sperm found on the rectal swab and Defendant's known DNA sample. The attempt was inconclusive because there was an insufficient quantity of DNA in the sperm fractions so that no comparison could be made. N.T. 7/17/14 pp. 132-33.

The Commonwealth's final witness was Officer John Kuryan of the City of Chester Police Department. Officer Kuryan testified that he was called to CCMC on October 29, 2012 to investigate the possible sexual assault of a juvenile. N.T. 7/16/14 p. 274. There he spoke with a patrol officer who had responded to the scene, the Victim's mother and father and with Nurse McAlinney. Id. at 275-76. [Father] ▮▮▮▮ said that the Victim was at his home and that the Defendant had been there for a few hours when there were several other children in the house. [Father] ▮▮▮▮ was not at home. [Mother] ▮▮▮▮ told Officer Kuryan about the underwear that she had discovered. [Father] ▮▮▮▮ also told Officer Kuryan about a prior occasion where he walked in on his two sons "in possibly a sexual act." Id. at 278-80. The Victim was lying in an examining room bed nearly asleep. Officer Kuryan did not interview him but asked [Mother] ▮▮▮▮ to bring her son to the police station the next day. Id. at 280-81.

On October 30, 2012 [Mother] ▮▮▮▮ and the Victim went to the City of Chester Police Department. Id. at 282. Officer Kuryan told the Victim that he was "looking into" what had happened over the weekend and why he [the Victim] was at the hospital. Id. at 283-84. The Victim was "combative" and changed the subject. Id. at 286. Officer Kuryan told the Victim that he knew about the blood-stained underwear and asked how he got it. Id. at 286. The

Victim was not willing to answer the question but told Officer Kuryan that the other children were at his father's home during the weekend and that the Defendant was also there. Id. at 286. The Victim continued on and told Officer Kuryan about an incident that occurred years earlier at his grandmother's house when Defendant sexually assaulted him. Id. at 286. He stated that the past weekend was the first time the brothers were together since that incident. Id. Concerning the current allegation, the Victim said that he didn't want to talk about it and that he and his brother were not gay. Id. at 288. He stated that he was in the living room alone with the Defendant, that they played video games and wrestled and that at some point they woke Ms. Anderson and she came into the living room to see what was going on. Id. at 288. When Officer asked about the underwear and the redness and tear that were reported by Nurse McAlinney the Victim offered the explanation that he had diarrhea from his father's cooking. Id. at 289-90. Officer Kuryan described the Victim as combative and argumentative during the interview. Id.

After this interview Officer Kuryan contacted Children and Youth Services and reported a possible sexual assault. Id. at 292. On November 1, 2012 Emily Donahee of Children and Youth Services interviewed the Victim. During the course of the interview the Victim told Ms. Donahee that the Defendant "might have did it to me in my sleep." As the interview progressed the Victim said, "Yeah. He definitely did it in my sleep." See Exhibit D-1.[8] She shared her interview with Officer Kuryan and he continued his investigation. Id. at 298; See also Exhibit D-1. Officer Kuryan met with Ms. Anderson at her home and crime scene officers went to the scene and took a sofa cushion cover into custody for testing. Id. at 297. Officer

---

[8] This tape recorded interview was played for the jury in its entirety during the course of trial counsel's cross examination of the Victim. See N.T. 7/15/14 p. 220.

11

Kuryan attempted to contact the Defendant and left his card and a request for the Defendant to contact him. These efforts were unsuccessful. He also tried to meet with ~~Father~~. ~~Father~~ agreed to meet with the officer but did not appear at the designated date and time of the pre-arranged meeting. Id. at 300.

Defendant was arrested on November 13, 2012. After his arrest Officer Kuryan advised the Defendant of his *Miranda* rights. N.T. 7/17/12 p. 5, 9, 10. The Defendant waived his rights and complied with Officer Kuryan's request for a Buccal swab sample for DNA testing. Id. at 11. An interview followed. Defendant admitted that he was with his brother at ~~Father's~~ house but claimed that he and the Victim played video games and that he never touched his brother. Id. at 12-13.

On November 14, 2012 Officer Kuryan and Ms. Donahee met with the Victim at his school. The interview was tape-recorded and that recording was played for the jury during the course of trial counsel's cross-examination of the Victim. See N.T. 7/16/14 pp. 10-52; Exhibit D-2. During the course of this interview the Victim stated that the Defendant "did it" to him and then he felt it and woke up. Id. at 35. He told Officer Kuryan and Ms. Donahee that Defendant put his penis in his butt and that he woke up and pushed Defendant out. Id. at 37. Additionally, the Victim said that Defendant had done this once before at his grandmother's house when the Victim was about ten years old. Id. at 37-38. The Victim provided additional information about the circumstances that surrounded the current incident and the interview was concluded. Id. at 38-51.

Trial counsel cross-examined each Commonwealth witness at length. In cross examining the Victim he suggested that the Victim was an admitted habitual liar, that he had

12

been diagnosed with various mental disorders and that the influence of medications rendered his testimony and his account of events unreliable. See e.g. N.T. 7/15/14 pp. 208 -09, 215-16. He challenged the Victim's truthfulness with various inconsistent statements and with his failure to immediately report the assault to Ms. Anderson, ████████ *Mother*, ███████ *Father*, Nurse McAlinney, and Officer Kuryan. Counsel played both the November 1st taped interview by Ms. Donahee and the November 14th interview with both Officer Kuryan and Ms. Donahee in court in an effort to convince the jury that Officer Kuryan and Ms. Donahee employed unduly suggestive interview tactics and that the Victim tailored his story to satisfy the interviewers. He attempted to discredit the Victim's testimony through questions that were designed to lead the jury to the conclusion that he was a troubled kid who felt unloved by his parents, whose father was a drunk, who sought attention by lying and who wished that he had his own "blood" baby to love. See e.g. id. at 227.

Trial counsel's cross examination of Officer Kuryan was designed to portray a sloppy and incomplete investigation by an incompetent police officer. He raised the fact that the City of Chester Police Department did not have a written protocol to be used in sexual assault cases. N.T. 7/17/12 p. 22-23. He questioned Officer Kuryan's interview skills and style, the fact that the interviews were not videotaped and inquired into the extent of his investigation into Defendant's alibi defense. See N.T. 7/17/15 p. 21-22. Trial counsel raised a myriad of perceived errors in Officer Kuryan's investigation, suggesting among other things that his failure to consult with other law enforcement agencies during his investigation including the Federal Bureau of Investigation, the Pennsylvania Attorney General's Internet Crimes Against Child Taskforce, the national District Attorney's Association, and the Pennsylvania State Police,

13

before preparing the Affidavit of Probable Cause that is attached to the Criminal Complaint rendered his investigation deficient and he argued in his closing that Officer Kuryan was a "lazy" and "incompetent" investigator who has "shown no aspirations of achieving any kind of significant promotion other than an officer," who "targeted" the Defendant. Id. at 21-29; 7/18/14 pp. 8-25. He raised the fact that Officer Kuryan listened to the November 1st interview but did not have it transcribed before he filed the Affidavit of Probable Cause. N.T. 7/17/14 p. 34. He questioned the Officer's failure to videotape interviews with the Victim and with other witnesses. Id. at 36-39. Trial counsel suggested that Officer Kuryan was incompetent and that his credentials were inadequate. Id. at 46-48 . He suggested, among other things that the crime scene investigation was lacking because photographs were not taken and suggested that Officer Kuryan should have used his personal cell phone or purchased a disposable camera to perform the task. Id. at 41-50.

Defendant testified in his defense and a series of character witnesses testified as well. Defendant testified that on Friday, October 26, 2012 he went on a trip to Dorney Park. N.T. 7/17/15 p. 314. He left at 5:00 p.m. and returned at about 1:00 a.m. Id. at 314-317. At about 1:15 a.m. he went to ▓▓▓▓▓▓ home. Id. at 318. The Defendant and the Victim played video games in the living room of the home. At first other children were there but later the brothers continued to play alone. At some point the brothers were "play fighting" and Ms. Anderson went down to the living room and told them to be quiet because they were waking the baby. Id. at 322. They continued to play video games until about 3:15 a.m. when Ms. Anderson returned and told them to "shut it down." Id. at 324. He denied that he had ever assaulted his brother. Id. at 326-339. Defendant recalled his November 13, 2012 interaction with

14

Officer Kuryan after his arrest. At that time, he testified, he told Officer Kuryan that he did nothing and that the officer should check with his father again because [Father ████] was previously locked up for rape, [Father ████] had a long criminal record and that [Father ████] slept with the Victim. Id. at 337-39. See also id. at 344-47.

The jury's verdict does not "shock the conscience of the court." The Victim and the Defendant spent time alone together during the early morning hours of Saturday, October 27, 2012. The Victim was asleep and he woke up and pushed the Defendant off and out of him when he felt the Defendant's penis in his butt. The Victim did not immediately report the assault but when his mother discovered his blood-stained underwear he was taken to CCMC for an examination. Nurse McAlinney observed that the Victim's anus was red and a small tear was present. Through an anal swab it was determined that sperm was present. The Defendant and the Victim each testified as to his own recollection of events and each was extensively cross examined. [Father's ████] testimony suggested that this was not Defendant's first attempt to sexually assault his brother, lending credibility to the Victim's testimony that the Defendant assaulted him. The jury weighed the evidence and made its determination regarding the credibility of the witnesses. The Defendant invites the court to commit an abuse of discretion by re-assessing the credibility of the witnesses and to conclude that the Defendant's testimony was credible and that his testimony, along with that of his character witnesses, was "so clearly of greater weight that to ignore [it] or to give them equal weight with all the facts is to deny justice." See e.g. Commonwealth v. Widmer, supra. However, all of the evidence demonstrates that the Victim was sexually assaulted and the jury found that the credible evidence proved beyond a reasonable doubt that Defendant was the perpetrator.

15

Defendant's "weight of the evidence" claim is unfounded and does not entitle him to a new trial.

## Prior Bad Acts

Generally, evidence of distinct crimes or other bad acts is not admissible against a defendant being prosecuted for another crime solely to show his bad character and his propensity for committing criminal acts. However, such may be admissible in special circumstances where the evidence is relevant for some other legitimate purpose and not merely to prejudice the defendant by showing him to be a person of bad character. See e.g. Commonwealth v. Horvath, 781 A.2d 1243, 1246 (Pa.Super. 2001). Pennsylvania Rule of Evidence 404(b), which embodies this principle, provides in pertinent part:

> (1) Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith.
>
> (2) Evidence of other crimes, wrongs, or acts may be admitted for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.
>
> (3) Evidence of other crimes, wrongs, or acts proffered under subsection (b)(2) of this rule may be admitted in a criminal case only upon a showing that the probative value of the evidence outweighs its potential for prejudice.

See also Commonwealth v. Judd, 897 A.2d 1224 (Pa. Super. 2006) (evidence of distinct crimes is inadmissible solely to demonstrate a defendant's criminal tendencies but is admissible to show a common plan, scheme or design embracing commission of multiple crimes, or to establish the identity of the perpetrator, so long as proof of one crime tends to prove the others).

16

In Commonwealth v. Lomax, 8 A.3d 1264 (Pa. Super. 2010) the defendant was charged with raping his eleven-year old niece. The incident for which he was convicted took place in 2008. The defendant entered the room where the victim was sleeping, removed her clothing and his own, put his penis in her vagina and her mouth and then told her not to tell anyone. Evidence of an earlier 2007 incident that was witnessed by the victim's aunt was admitted into evidence. Both the victim and her aunt testified that in 2007 the defendant rubbed against the victim as he passed her in a hallway in her house. The victim's aunt felt that the defendant was "too close" to the victim and asked what was going on. The defendant said "nothing." Following this incident the defendant did not return to the victim's home for several months.

On appeal the defendant claimed that the admission of this evidence constituted an abuse of discretion. In support he argued that the prior act had no probative value because it was not sufficiently similar to the rape, that the prior act was too remote in time to have probative value and that even if the evidence had probative value, it was outweighed by its potential for creating unfair prejudice, where it would cause the jury to be predisposed to finding he committed the crimes charged. After considering each of these grounds the Superior Court rejected the defendant's claim. Defendant's prior conduct was admissible to show the defendant's continuing and escalating conduct as it related to his victim. The fact that the behavior was not exactly the same did not preclude its admissibility because it demonstrated "a passion or propensity for illicit sexual relations with the particular person concerned in the crime on trial." Id. at 1267. The Court found the familial relationship between the parties and the continuing and escalating nature of the defendant's sexual

17

misconduct aimed at his niece significant. Finally, a ten-month gap between the two incidents did not render is too remote in time to be probative.

Similarly in this case a familial relationship exists. The assaults took place in similar circumstances when the brothers were alone at night and their father was away from home. ~~██████~~ saw the Defendant and the victim and ordered the Defendant to "get off my son." He took the Victim upstairs to sleep in his room, away from the Defendant and reported the incident to ~~██████~~ the Victim's mother. Thereafter the victim was not allowed to spend time with the Defendant. The current incident occurred approximately two years later. However, any claim that the first incident was too remote in time is negated by the fact that during the time between the two incidents the brothers were never together. This was the first time that the Defendant had the opportunity to spend time with the Victim and his first opportunity to commit another sexual act against him. C.f, Commonwealth v. O'Brien, 836 A.2d 966, 971 (Pa. Super. 2003) (prior crimes that occurred in 1982 and 1985 were admissible at trial for 1996 offense where defendant was incarcerated from 1985 to 1990).

Under these circumstances the probative value of the evidence outweighed its inherent prejudice. The Defendant admitted that he was alone with the Victim but claimed that he never touched his brother inappropriately. In his statement to police he suggested that his father could be the culprit, placing the identity of the Victim's assailant at issue. As in Lomax, supra, this evidence demonstrated the Defendant's propensity for illicit sexual relations with the Victim and was admissible. Additionally, undue prejudice was avoided when in closing instructions the Court advised the jury that information concerning the earlier incident was for

18

them to consider only as background only and that Defendant could only be found guilty for the October 2012 incident for which he was charged. N.T. 7/18/13 p. 117-18.

### Admissibility of the Victim's Testimony and Evidence of His Out-of-court Statements

Next, Defendant claims that the trial court erred in "failing to grant a motion to exclude the testimony of the victim and all out-of court statements made by the victim where the testimony and statements were the direct result of unduly suggestive interviews conducted by Officer John Kuryan and CYS Worker Emily Donahee." This is a claim that gives rise to the question of whether the Victim's was rendered incompetent to testify by suggestive interview techniques. See Commonwealth v. Delbridge, 855 A.2d 27, 39, 40 (Pa. 2003) (an allegation that the witness's memory of the event has been tainted raises a question of competency)

In Pennsylvania, the general rule is that every witness is presumed to be competent to testify and the determination of a witness's competency rests within the sound discretion of the trial court. See e.g. Commonwealth v. Judd, 897 A.2d 1224, 1228 (Pa. Super. 2006) citing Commonwealth v. Delbridge, 855 A.2d 27, 39 (Pa. 2003). However, our Supreme Court has recognized that the implantation of false memories or the distortion of real memories caused by interview techniques of law enforcement, social service personnel, and other interested adults, that are so unduly suggestive and coercive as to infect the memory of a witness can render that witness incompetent to testify. Commonwealth v. Delbridge, supra,. In *Delbridge* our Supreme Court examined the concept of "taint" where the challenged testimony involved a six-year-old witness and held that taint is a legitimate question for examination in cases involving complaints of sexual abuse made by young children. "Where it can be demonstrated that a witness's memory has been affected so that their recall of events

19

may not be dependable, Pennsylvania law charges the trial court with the responsibility to investigate the legitimacy of such an allegation." Commonwealth v. Delbridge, 855 A.2d at 40 *citing* Commonwealth v. Rolison, 374 A.2d 509 (Pa. 1977)

"A person is incompetent to testify if the court finds that because of a mental condition or immaturity the person:(1) is, or was, at any relevant time, incapable of perceiving accurately; (2) is unable to express himself or herself so as to be understood either directly or through an interpreter; (3) has an impaired memory; or(4) does not sufficiently understand the duty to tell the truth". Pa.R.E. 601. See also Rosche v. McCoy, 156 A.2d 307, 310 (Pa. 1959) (competency requires (1) "capacity to communicate, including as it does both an ability to understand questions and to frame and express intelligent answers, (2) mental capacity to observe the occurrence itself and the capacity of remembering what it is that she is called to testify about and (3) a consciousness of the duty to speak the truth.") In *Delbridge* the Court explained that "[t]aint speaks to the second prong of the competency test established in *Rosche*, "the mental capacity to observe the occurrence itself and the capacity of remembering what it is that [the witness] is called upon to testify about." 855 A.2d at 40.

The proponent of a claim that a witness is incompetent to testify because unduly suggestive tactics have rendered him incompetent must, at the outset, show some evidence of taint. After this initial this burden has been met the party alleging taint bears the burden of production of evidence of taint and the burden of persuasion at a competency hearing to show taint, sufficient to overcome the presumption of competency, by clear and convincing evidence. Delbridge, 855 A.2d 27, 40-41. "The clear and convincing burden accepts that some suggestibility may occur in the gathering of evidence, while recognizing that when considering

20

the totality of the circumstances, any possible taint is sufficiently attenuated to permit a finding of competency." Id. When determining whether a party has made a sufficient showing of some evidence of taint so as to require a hearing, the totality of the circumstances surrounding the revelation of the allegations will be examined. Id.

Although trial counsel filed a plethora of pre-trial motions in this matter, a motion raising a competency challenge based on the allegedly unduly suggestive interviews conducted by Officer Kuryan and Ms. Donahee is not among them. "Defendant, ▰▰▰▰ T.S.N.'s ▰▰▰ Motion to Dismiss and/or Quash Due to Mental Incompetence and/or Defect of the Alleged Victim, or, in the Alternative, to Order a Competency Evaluation of the Alleged Victim," filed on June 14, 2013 sets forth the Victim's age[9], and allegations that he has been treated for Bipolar Disorder and Attention Deficit Disorder, that he is a "habitual liar," that his father does not trust him and "he may have behavioral issues," and that investigators failed to properly inquire into the Victim's mental status regarding his ability to truthfully report and understand events. The motion is full of general allegations that suggest that the Victim might not be a credible witness but is devoid of allegations of fact that suggest either that he is mentally incompetent or that show evidence of taint and Defendant, having failed to meet his initial burden, was not entitled to a hearing on this issue.

Finally, because the Victim was almost sixteen years old at the time he testified his competency cannot be challenged based on age alone. Rather, his ability to correctly remember the events in question was properly a question of credibility, and not a question of competency. See Commonwealth v. Judd, supra.

---

[9] The Victim was fifteen years old when he testified at trial. N.T. 7/15/14 p. 169. He would turn sixteen in one month ▰ August ▰ 2014.

## Witnesses Precluded From Testifying

Next, Defendant claims that the Court erred by excluding the testimony of crime scene detective Ernest Minercha and two DNA experts. Generally, "All relevant evidence is admissible," and evidence is relevant if it has any tendency to make a fact of consequence in determining the action more or less probable than it would be without the evidence. See Pa. R.E. 401 & 402.  See also Commonwealth v. Cook, 952 A.2d 594, 612 (Pa. 2008). However, Rule 403 of the Rules of Evidence provides for the exclusion of relevant evidence if its probative value is outweighed by a danger of, *inter alia*, "undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403. The trial court's determination as to whether evidence is relevant or whether relevant evidence may be excluded pursuant to Pa.R. E 403 is a matter within the court's discretion. Commonwealth v. Marshall, 568 A.2d 590 (Pa. 1989).

During the Defendant's case trial counsel indicated that he intended to call crime scene investigator Detective Ernest Minercha to testify. N.T. 7/17/14 p. 214. Trial counsel was asked for an offer of proof. In response he stated that he was calling Detective Minercha to show "reasonable doubt of failure to investigate." Id. at 215. Trial counsel explained that he intended to ask Detective Minercha "to discuss what he was directed or not directed to do by [Officer Kuryan.] Id.  While Detective Minercha was called to the crime scene, as testified to by Officer Kuryan, see id. at 43-95, the only evidence he  seized from the premises was a sofa cushion cover that appeared to be stained with bodily fluids and  was submitted for DNA testing.  No additional evidence from the scene was offered into evidence by the Commonwealth.

22

After considering trial counsel's offer of proof, the Court ruled that Detective Minercha's testimony would not be allowed. Concerning any biological material that was collected from the cushion cover, no results of DNA testing were offered into evidence by the Commonwealth and it was agreed that testing was inconclusive. Concerning the contention that Detective Minercha's testimony would lend credence to Defendant's claim that the investigation in this matter was sloppy and incomplete, the testimony would be cumulative. On cross-examination Officer Kuryan admitted that he and his crime scene investigators did not visit the scene until several days after the incident occurred, that he did not take photographs or measurements at the scene, that he did not ask crime scene investigators to take photographs and measurements and that none were taken. He testified that he did not ask for blue jeans or other clothing that the Victim may have worn, and that he followed no known protocols. Id. at 49-55, 77-95, 127. These facts were not in dispute and trial counsel's offer of proof suggested that the testimony would be merely cumulative and that it had no additional probative value. See Commonwealth v. Flamer, 53 A.3d 82, 88 (Pa. Super. 2012) (additional evidence of the same character as existing evidence that supports a fact established by the existing evidence is cumulative); Commonwealth v. G.D.M., Sr., 926 A.2d 984, 989 (Pa. Super. 2007) (Evidence may be excluded if its probative value is outweighed by the "needless presentation of cumulative evidence).

Lauren Force, a forensic DNA analyst with the PSP, and Carolyn Oleyar, a forensic scientist and a qualified expert in serology, were subpoenaed to testify for the defense. Although trial counsel stipulated to the fact that attempts at a DNA comparison between Defendant's known DNA sample and the biological material found in the Victim's underwear

23

and the sperm on the rectal swab yielded inconclusive results, see N.T. 7/17/14 pp. 132-33, trial counsel wanted the jury to hear a broad description of the witnesses' expertise, testing procedures, how they determine whether results are conclusive or inconclusive and the fact that an inconclusive result means "it cannot be linked to the identity of the Defendant." N.T. 7/16/14 p. 308. Because the parties stipulated that the DNA test results were inconclusive this testimony was simply no longer relevant. It has no tendency to make a fact of consequence more or less probable than it would be without the evidence. Further, it is respectfully suggested that the broad survey of the field of DNA analysis that trial counsel intended would serve only to mislead the jury and cause undue delay. In the circumstances of this case and given the phrasing of the stipulation that was entered into evidence, the meaning of the term "inconclusive" as applied here could only be understood to mean that Defendant could not be tied to this event through DNA testing. The meaning of the term was easily understood by an ordinary layman without additional expert explication, and the Defendant was not prejudiced by the exclusion of this testimony .

Motion for Mistrial

Finally, Defendant claims that the Court erred by denying trial counsel's motion for a mistrial following the prosecutor's closing argument. It is alleged that the prosecutor commented on facts that were not in evidence when he referred to the "character traits of a sexual assault victim" and that these comments resulted in prejudice to the Defendant. See Statement of Matters Complained of on Appeal, ¶ III. The allegedly objectionable comment, which was made in the course of a closing argument that focused on the credibility of the Victim, follows: "Victims like [this Victim,] real victims feel embarrassed. Fakers, liars, feel

24

self-righteous. Think about that. He can't fake these things. He would have no way of knowing that this is the way real sex assault victim acts(sic). And he would—he's not advanced enough to act, to actually perform this well." N.T. 7/18/14 p. 58.

"The trial court is vested with discretion to grant a mistrial whenever the alleged prejudicial event may reasonably be said to deprive the defendant of a fair and impartial trial. In making its determination, the court must discern whether misconduct or prejudicial error actually occurred, and if so, ... assess the degree of any resulting prejudice." Commonwealth v. Judy, 978 A.2d 1015, 1019 (Pa. Super. 2009). "The remedy of a mistrial is an extreme remedy required 'only when an incident is of such a nature that its unavoidable effect is to deprive the appellant of a fair and impartial tribunal.' With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that '[i]n reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made.'" Id. (citations omitted). "[P]rosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Id. at 1020. In *Judy*, supra, the Court noted that on review, an appellate court is charged with determining "whether a defendant received a fair trial, not a perfect trial." Id. *citing* Commonwealth v. Rios, 721 A.2d 1049, 1054 (Pa. 1998).

In considering Defendant's claim the prosecutor's comments must be examined within the context of defense counsel's conduct. Trial counsel devoted a significant portion of his closing argument to portraying the Victim as a habitual liar, a mentally challenged individual

25

who was medicated with "copious amounts of medication" that hampered his ability to recall and that he functioned in an altered state. He argued that the Victim lied to get attention and that he would say anything to get anyone to like him. See e.g. id. at 12, 25-27, 34-35, 42-43. In his testimony the Victim admitted that he lied to his parents and authorities when he first reported that nothing had happened but that he later told the truth to Officer Kuryan and Ms. Donahee and that he was telling the truth at trial. In response to trial counsel's argument, the prosecutor suggested, among other things, that the Victim's repeated denials lent credibility to his later reports and to his trial testimony. He suggested that a teenaged boy would be embarrassed to recount non-consensual sex with another male, especially his brother. When viewed in larger context it is apparent that, although the prosecutor made a single reference to the term "sex assault victim," in fact he was urging the jury to consider that this teenaged boy's behavior was "realistic," and how it bore on his credibility:

> I mean, just imagine yourselves, while you're back in the deliberation room. Try to imagine if you have to turn and tell each other about your last consensual adult sexual experience. Try to imagine that. Looking someone in the eye and telling them about the last time you had a sexual experience and that's going to be consensually. Imagine how hard it is to talk about it when it was non-consensual and you're a kid. He didn't want anyone to think he's gay. He didn't want to talk about this. He's not looking for attention. Victims like [this Victim,] real victims feel embarrassed. Fakers, liars, feel self-righteous. Think about that. He would have no way of knowing that this is the way a real sex assault victim acts. And he would – he's not advanced enough to act, to actually perform this well.

Id. at 58. See also id. at 51-58.

The prosecutor made no other reference to "sex assault victims" or to the behavioral characteristics of victims who are sexually assaulted. The isolated and incorrect use of this single term was perhaps unfortunate but it did not work to prejudice the jurors by forming in their minds a fixed bias and hostility toward the Defendant. Their ability to weigh the evidence objectively and render a true verdict was not impeded and most importantly this single reference did not deny the Defendant the fair trial to which he is entitled.

In light of the foregoing it is respectfully submitted that judgment of sentence should be affirmed.

BY THE COURT:

James P. Bradley, J.

27