721 A.2d 1049

**COMMONWEALTH of Pennsylvania, Appellee,**

**v.**

**Miguel RIOS, Appellant.**

Supreme Court of Pennsylvania.

Argued April 28, 1998.

Decided Nov. 23, 1998.

420

Earl G. Kauffman, Philadelphia, for Miguel Rios.

Catherine Marshall, William Spade, Jr., Philadelphia, Robert A. Graci, Office of Atty. Gen., for the Com.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO, NEWMAN and SAYLOR, JJ.

## OPINION OF THE COURT

CASTILLE, Justice.

This is a direct appeal from a sentence of death imposed by the Court of Common Pleas of Philadelphia County.[1] Following a jury trial, appellant was convicted of first degree murder,[2] burglary,[3] conspiracy,[4] robbery,[5] possession of an instrument of crime[6] and unlawful restraint.[7] The jury found three aggravating circumstances and no mitigating circumstances

1. 42 Pa.C.S. § 9711(h)(1).
2. 18 Pa.C.S. § 2502(a).
3. 18 Pa.C.S. § 3502(d)(11).
4. 18 Pa.C.S. § 903.
5. 18 Pa.C.S. § 3701
6. 18 Pa.C.S. § 907(a).
7. 18 Pa.C.S. § 2902.

and returned a sentence of death.[8] The trial court later imposed concurrent terms of imprisonment of thirty-six to seventy-two months for the burglary conviction, forty-eight to ninety-six months for one of the robbery convictions, eight to sixty months for the weapons offense, and eighty to one hundred sixty months for the conspiracy conviction.[9]

Appellant first alleges that the evidence was insufficient to sustain a conviction for murder in the first degree.[10] In reviewing the sufficiency of the evidence, this court must determine whether the evidence admitted at trial and all reasonable inferences drawn therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, is sufficient to support all the elements of the offense beyond a reasonable doubt. *Commonwealth v. Bronshtein*, 547 Pa. 460, 469, 691 A.2d 907, 911 (1997), *cert. denied*, —— U.S. ——, 118 S.Ct. 346, 139 L.Ed.2d 269 (1997).

Testimony at trial established that, on September 19, 1992, at 6:30 p.m., Iris Basilio was sitting on the front porch of her house on Marshall Street in Philadelphia with her sister-in-law, Elizabeth Basilio, who was four months pregnant. Iris' four children, two girls ages 11 and 4, and two boys ages 9 and 10, were in the house watching television. Iris' husband, Miguel Basilio, was not home. Iris and Elizabeth observed appellant walk by the house twice. One hour later, appellant

8. The three aggravating circumstances were that the murder was committed in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); that appellant had a significant history of violent felony convictions involving the use or threat of violence to another person, 42 Pa.C.S. § 9711(d)(9); and that appellant had been convicted of another murder before or at the same time as the instant offense, 42 Pa.C.S. § 9711(d)(11). The verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances. 42 Pa.C.S. § 9711(c)(1)(iv).

9. The terms of imprisonment were to run concurrently to each other but consecutively to the death penalty.

10. Additionally, in all cases where the death penalty has been imposed, this Court is required to conduct a review of the sufficiency of the evidence. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied*, 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

and his co-conspirator, who has never been identified, crossed the lawn and approached the house. When they reached the porch, appellant drew a gun and ordered Iris and Elizabeth into the house.

Appellant and his co-conspirator proceeded to terrorize the women and children for two and a half hours. Appellant threw Iris and Elizabeth onto the floor and demanded that the children lie on the floor next to them. The co-conspirator stood to the side with an Uzi machine pistol pointed at the victims. Iris asked appellant not to force Elizabeth to lie on the floor because she was pregnant. Appellant told her to shut up.

As the children cried and screamed, appellant grabbed Iris by the hair, told her that he knew that she was Miguel's wife and stated that she must know where Miguel's money was kept. While pointing his gun at Iris' head, appellant ripped the jewelry from her wrists and neck. He dragged her upstairs, slapped her and demanded to know where the money was kept. After Iris informed him that there was no money, appellant began ripping clothes out of drawers, finding $400 in cash and a bracelet. Appellant continued to hit Iris in the face while demanding more money.

He then dragged Iris back downstairs to the living room where the co-conspirator still held the Uzi on Elizabeth and the children. The ten-year-old boy screamed and the co-conspirator put the barrel of the Uzi into the boy's mouth. Elizabeth screamed for the co-conspirator not to kill the boy and appellant put the barrel of his gun into her mouth.

Appellant ordered Iris to the basement, where he repeatedly beat her about the face and kicked her in the back while still demanding to know where the money was. Iris again stated that there was no more money. Appellant pointed his gun at her temple and told her to kneel down because he was going to kill her.

Eventually, appellant pulled Iris back upstairs, where he ransacked the kitchen and the living room searching for money. The four-year-old girl was screaming, and Iris

begged appellant to let the child have some milk to calm her down. Instead, appellant threatened to kidnap the child and sell her at "a certain place" for $20,000.

Appellant took Iris upstairs again and ransacked the children's rooms looking for money. He ordered Iris to disrobe. After she removed her shirt and pulled her pants down to her ankles, appellant hit her on the back of the head with the gun and told her to put her clothes back on, claiming: "That's not what I came for."

Appellant took Iris back downstairs to the living room, where he continued to beat her. Elizabeth pleaded with appellant to stop hitting Iris, and the co-conspirator hit Elizabeth in the thigh with the Uzi. Appellant pulled out a razor blade and pressed it against Iris' face in front of her children. Appellant told her that he would cut her face, cut off one of her ears and one of her breasts unless she told him where the money was hidden. He also threatened to. "cut [Elizabeth's] belly open and take the baby out." He then put his gun to the eleven-year-old girl's temple and dragged her into the kitchen to get milk for the screaming four-year-old.

Appellant and his co-conspirator then forced Elizabeth and the children down to the basement, lined them up against the wall and ordered them to pray because appellant was going to kill them. Iris begged appellant to have mercy for the children. He took Iris into a corner and continued to beat her. Appellant then tied Iris and Elizabeth up with masking tape and stuffed rags in their mouths. After the women were bound, appellant and his co-conspirator took turns waiting upstairs for Miguel to arrive.

Eventually, appellant returned to the basement holding Miguel at gunpoint. Appellant forced him to go from room to room looking for money. When the search proved fruitless, appellant returned to the basement with Miguel and threatened to rape the eleven-year-old girl. Miguel lunged at appellant and the co-conspirator restrained him. The two men kicked Miguel's face and stomach and beat him until Miguel begged them to kill him and get it over with.

Miguel gave appellant a beeper number of someone who could deliver money. Appellant called the number, but did not receive a return call. Miguel continued to plead with appellant to kill him, but to spare his wife, sister and children. The co-conspirator and appellant had a short conversation in English,[11] and immediately thereafter, the co-conspirator shot Miguel in the stomach. Appellant stood over the injured Miguel and declared that he "deserved it." Appellant and the co-conspirator then fled the house.

Miguel lay bleeding on the basement floor and told his wife that he was wounded, but Iris could not render assistance because she was tied up. Eventually, two of the children managed to untie Iris and Elizabeth. Iris attempted to help her husband while Elizabeth ran screaming into the street to summon help. Miguel subsequently died from the gunshot wound.

Elizabeth later identified appellant from a photo array.[12] A warrant was issued for appellant's arrest. Police arrested appellant five weeks later after finding him hiding beneath a pile of clothes in his girlfriend's bedroom closet.

Appellant asserts that the evidence presented at trial was insufficient because it failed to prove that he shared the requisite state of mind with his co-conspirator who shot and killed Miguel. It is well established that an accomplice is equally criminally liable for the acts of another if he acts with the intent of promoting or facilitating the commission of an offense and agrees, aids, or attempts to aid such other person in either planning or committing that offense. *Common-*

11. The co-conspirator spoke only English, appellant spoke Spanish and English and the victims understood only Spanish.

12. Several days after the attack, Elizabeth was riding in a car with her brother and his wife when she spotted appellant. She screamed and told her brother that appellant was the man who had terrorized her. Elizabeth's brother also identified appellant out of a photo array. Further, two men who had been in the vicinity of the house on the night of the attack observed appellant and his co-conspirator drive by the house several times and linger around the entrance of the alley that ran behind the house. These men also identified appellant out of a photo array.

*wealth v. Spotz,* 552 Pa. 499, 716 A.2d 580 (Pa. 1998). In order to sustain a conviction for first degree murder via accomplice liability, the Commonwealth's evidence must be sufficient to establish that appellant possessed specific intent to kill. *Id.* Whether an accomplice possessed the same intent to kill as his co-conspirator may be inferred from words, conduct, the attendant circumstances including the actions taken after the killing and all reasonable inferences that follow from them. *Id.; Commonwealth v. Bachert,* 499 Pa. 398, 406, 453 A.2d 931, 935 (1982), *cert. denied,* 460 U.S. 1043, 103 S.Ct. 1440, 75 L.Ed.2d 797 (1983).

Here, the evidence clearly establishes that appellant possessed the specific intent to kill Miguel Basilio. Appellant and his co-conspirator worked as a team throughout the entire criminal episode which culminated in Miguel's murder. They staked out the house together and the co-conspirator held the women and children at gunpoint in the living room while appellant dragged Iris throughout the house looking for money. They worked together to tie up their victims and they took turns watching the upstairs of the house for Miguel to arrive. In addition to the violence appellant inflicted upon the victim's family, he repeatedly smashed Miguel's head against the concrete basement floor, held him at gunpoint, allowed the co-conspirator to hold him at gunpoint, and conferred with the co-conspirator immediately before the fatal shot was fired.[13] After stating that Miguel deserved to be shot, appellant fled

13. Appellant and his co-conspirator had a brief conversation in English immediately before the victim was killed. The exact content of the conversation is not known however, because Iris, Elizabeth and the children understood only Spanish. Appellant asserts that because the content of this conversation is unknown, the facts fail to demonstrate that appellant and his co-conspirator shared an intent to kill the victim. Appellant's reasoning in this regard is flawed. "An explicit or formal agreement to commit crimes can seldom, if ever, be proved, and it need not be, for proof of a criminal partnership is almost invariably extracted from the circumstances that attend its activities." *Commonwealth v. Kennedy,* 499 Pa. 389, 395, 453 A.2d 927, 929–930 (1982). Here, the attendant circumstances surrounding the crime are sufficient to establish appellant's intent. His conduct before, during and after the criminal episode demonstrates a unity of criminal purpose with the co-conspirator who shot Miguel.

with the co-conspirator, leaving Miguel to die while his family stood by with their hands tied, unable to render assistance. These facts fully support the jury's determination that appellant intended to facilitate Miguel's death and, therefore, that he was guilty of first-degree murder. Thus, we conclude that appellant's challenge that the evidence was insufficient to establish the requisite specific intent is without merit. Further, based upon our independent review of the record, we are satisfied that sufficient evidence was produced at trial from which the jury could have found each element of an intentional killing beyond a reasonable doubt. *See* 18 Pa.C.S. § 2502(a),(d).

Next, appellant asserts that he was denied a fair trial because of prosecutorial misconduct during closing arguments in the guilt phase.[14] In support of his argument, appellant quotes a small portion of the prosecutor's closing argument where the prosecutor stated:

> ... so what were those words in English? Was it let us leave, or get rid of him, take him out? They're not going to fire a whole lot of shots, because then people in the street are going to hear the shot, so you take a careful aim and shoot.

(N.T. Vol. 7 at 52). Appellant alleges that the prosecutor improperly referred to facts not in evidence by mentioning the brief conversation that appellant had with his co-conspirator in English immediately before the co-conspirator shot the victim and, in so doing, inflamed the passions or prejudices of the jury. We disagree.

The decision whether to grant a new trial because of prosecutorial misconduct is within the discretion of the trial court and will not be disturbed on appeal absent an abuse of

---

14. In his brief, appellant makes the blanket statement that he "was denied a fair trial by the prosecutorial misconduct of the Assistant District Attorney in his closing arguments in both the trial and penalty phases of this case ..." (Appellant's Brief at 13). However, appellant fails to cite to any specific portion of the prosecutor's closing argument in the penalty phase which allegedly caused him prejudice. Accordingly, we address only the issues relating to the prosecutor's closing argument in the guilt phase.

discretion. *Commonwealth v. Rios*, 546 Pa. 271, 287, 684 A.2d 1025 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997). In reviewing allegations of prosecutorial misconduct, this Court evaluates whether a defendant received a fair trial, not a perfect one. *Commonwealth v. Washington*, 549 Pa. 12, 27, 700 A.2d 400, 407 (1997)(quoting *Commonwealth v. Holloway*, 524 Pa. 342, 353, 572 A.2d 687, 693 (1990)). A prosecutor is permitted to vigorously argue his case as long as his comments are supported by evidence and contain inferences that are reasonably derived from the evidence. *Commonwealth v. LaCava*, 542 Pa. 160, 181, 666 A.2d 221, 231 (1995). To constitute reversible error, the language must be such that its unavoidable effect would be to prejudice the jury, forming in their minds fixed bias or hostility towards the defendant, so that they could not weigh the evidence and render a true verdict. *Holloway*, 524 Pa. at 353, 572 A.2d at 693. It is with these standards in mind that we evaluate the prosecutor's statements in the instant matter.

 The prejudicial effect of a prosecutor's remarks must be evaluated in the context in which they occurred. *Commonwealth v. D'Amato*, 514 Pa. 471, 490, 526 A.2d 300, 309 (1987). The prosecutor made the statement during the portion of his summation in which he discussed appellant's intent. The prosecutor stated:

> The deceased is a drug dealer, I won't play games with you. He was not a corner boy, he was high-level and when you go to rob a drug dealer, not a corner boy, but a guy making the real money, you can't just steal from them because they have to have respect on that street. When they went in there, they knew we are going to rob a dealer and we have to kill him because that is the way business is done. You don't rob a drug dealer. But they walked in there, that man was as good as dead.... Think of it as, I'm going over the fact, is the specific intent to kill, who was the leader in that house? Who ran things? He was watching that house. He goes in, he gives all the orders ... What words was he saying? When he took her downstairs to the basement by herself, what did he say, get on your knees and

pray, I'm going to kill you. Those were his words. As she prayed and pleaded with him not to kill her, what did he say when he took all the kids and everyone downstairs? Everybody against the wall and pray because I'm going to kill you. Those words were coming out of his mouth. He knew someone was going to die that day ...

What did they speak about in English? The victims don't know what was said, but what was it? Think of the two types of weapons they had. The black Puerto Rican guy had the Uzi, .9 millimeter. That's a more powerful caliber. What weapon did he have? The .38, which is deadly but not as powerful as the .9, **so what were those words in English? Was it let us leave, or get rid of him, take him out? They're not going to fire a whole lot of shots, because then people in the street are going to hear the shot, so you take a careful aim and shoot.**

[Defense counsel]: I object your honor.

(N.T. Vol. 7 at 51–52). When read in context, it becomes clear that the prosecutor's reference to the conversation between appellant and his co-conspirator did not refer to non-record evidence. The fact that the conversation took place is not in dispute. The prosecutor merely drew the juror's attention to the key pieces of evidence which demonstrated that appellant shared the specific intent to kill with his co-conspirator. The fact that the victim was a notorious drug dealer who was likely to seek revenge on appellant unless appellant killed him, that neighbors were likely to hear if numerous gunshots were fired from appellant's smaller gun and the fact that the co-conspirator, who happened to be holding a more effective weapon, shot the victim immediately after the conversation with appellant, all help to establish appellant's intent to have the co-conspirator kill the victim. The prosecutor did not state with certainty what words were spoken; rather, he merely pointed out to the jury that the surrounding evidence of the criminal episode can only lead to the reasonable and obvious inference that the conversation concerned killing the victim. A prosecutor has reasonable latitude in presenting his argument to the jury and his remarks may contain fair deductions and legitimate infer-

ences from the evidence. *D'Amato,* 514 Pa. at 490, 526 A.2d at 309. We find that this was a legitimate inference derived from the evidence and was therefore within the bounds of proper argument.

In addition, following defense counsel's objection, the trial court issued the following curative instruction to the jury:

> Ladies and Gentlemen, as always it is your recollection of what took place, not mine or counsel's, however, my recollection is that there was a conversation in English between the two persons and immediately after that conversation a shot was fired that killed Mr. Basilio. I do not recall that there was any testimony concerning what took place in that conversation between those two in English. [To defense counsel] is that satisfactory?
>
> [Defense counsel]: Yes, Your Honor, thank you.

(N.T. Vol. 7 at 54). Furthermore, the trial court instructed the jury at the beginning of the trial and during final instructions that the arguments of the lawyers were not evidence. Thus, even if the prosecutor's remarks had been improper, the trial court's instructions assured that appellant was not prejudiced. Accordingly, appellant is not entitled to a new trial on this basis.

Appellant further asserts that the prosecutor inflamed the passions and prejudices of the jury during closing argument in the guilt phase by explaining why he did not permit the children to testify. The prosecutor stated:

> And when the defense attorney says this is an emotional trial, trying to show emotions, I don't play games. Before this I did another murder case and after you are gone I'm going to do another one. I don't want to play games with emotion. I could put children up there and tear your heart apart. I do my job through my witnesses with respect and out of respect of that family. There were two adults in that house, adults have to deal with life. Let them do the job. I'll be damned if I'm going to put children up on the stand and put them through it again.
>
> [Defense counsel]: Objection, Your Honor.

(N.T. Vol. 7 at 57–58). The prosecutor's statements came after defense counsel's closing argument in which defense counsel inferred that the emotions of the case rendered the identification testimony against appellant unreliable. The overriding theme of defense counsel's argument was that the case against appellant was built on emotion rather than fact. For instance, defense counsel stated:

I told you from the start this is an *emotional* case as far as the evidence, as far as what you are going to hear ... I believe it was the Officer Boston testified that these women were almost in shock, they were so hysterical ... It's an *emotional* experience, the worse (sic) thing that can happen to somebody's family ... You heard [Iris Basilio] say she'll never forget [appellant's] face. You heard her *emotional* testimony ... Elizabeth [Basilio] is a very *emotional* woman. You can see how she testified. She's an *emotional* woman ... As I told you in the beginning, this is an *emotional* case. You can't decide on sympathy, you can't decide on *emotion* ... Think about it. Nothing about brown hair ... Nothing from the witnesses who were there for two hours under *emotional* situations ... In this case it's a difficult case because of the *emotions* involved. It's a difficult case because of the natural tendency to have sympathy.

(N.T. Vol. 7 at 12, 14, 20, 24, 25, 38–39)(emphasis added).

Thus, the prosecutor's statements assuring the jury that he had not appealed to their emotions but had simply done his job by not appealing to the jury's emotions was fair response to defense counsel's closing argument. Further, not every uncalled for or intemperate remark uttered by a prosecutor entitles a defendant to a new trial. *D'Amato*, 514 Pa. at 490, 526 A.2d at 309. We find the prosecutor's use of oratorical flair in responding to defense counsel's closing to be permissible.

Appellant next asserts that he was deprived of a fair trial because the trial court instructed the jury that flight and concealment tend to show consciousness of guilt if the accused

knows that he is wanted for a crime. Appellant asserts that he was prejudiced by the instruction because there was no evidence that he departed Philadelphia to escape capture for his involvement in the murder. This claim is meritless. Initially, we note that technically, appellant's claim is waived for failure to object to the flight charge when it was given to the jury by the trial court. Pa.R.Crim.P. 1119(b). Nevertheless, we may still reach the merits of the claim pursuant to the relaxed waiver rule in direct appeals involving capital cases as stated in *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 26 n. 3, 454 A.2d 937, 942 n. 3 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983), *reh'g denied,* 463 U.S. 1236, 104 S.Ct. 31, 77 L.Ed.2d 1452 (1983).

Here, detectives tried to locate appellant at his home in Philadelphia on September 29, 1992, but appellant's brother informed police that appellant had not been home or been seen since September 18. Appellant's photograph was circulated to other police units in the area. Police were unable to locate appellant until October 4, when he was found hiding under a pile of clothing in his girlfriend's apartment in Lancaster, Pennsylvania.

At the time that police were searching for appellant following his rampage in the Basilio house, he was wanted in connection with another murder which occurred less than one month prior to the murder of the victim in the instant matter. The arrest for both murders was effectuated when police found appellant hiding in a closet at his girlfriend's home. In affirming appellant's death sentence for the unrelated murder, this Court held that there was sufficient evidence to justify the flight charge issued by the trial court in that case. *Commonwealth v. Rios,* 546 Pa. 271, 291–92, 684 A.2d 1025, 1034–35 (1996), *cert. denied,* 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997) ("*Rios I* "). The evidence of flight in the instant matter is exactly the same as the evidence of flight in *Rios I,* where this Court stated:

Here, the evidence established that Appellant fled from the crime scene and police were unable to locate him at his home. The police also contacted Appellant's brother with-

out success. The distribution of defendant's photograph to officers in other precincts also proved futile. It was not until five weeks after the murder that police found Appellant hiding in a closet at his girlfriend's home in Lancaster. Because of these circumstances, the trial court had a sufficient basis to charge the jury that it could infer guilt from Appellant's flight.

*Id.,* 546 Pa. at 292, 684 A.2d at 1035. Accordingly, appellant's claim is meritless.

Finally, pursuant to 42 Pa.C.S. § 9711(h)(3), this Court has a duty to affirm the sentence of death unless we determine that:

(i) the sentence of death was the product of passion, prejudice or any other arbitrary factor;

(ii) the evidence fails to support the findings of at least one aggravating circumstance specified in subsection (d); or

(iii) the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the circumstances of the crime and the character and record of the defendant.[15]

After reviewing the record below, we conclude that the sentence imposed was not the product of passion, prejudice or any other arbitrary factor, but rather based upon the testimony of the eyewitnesses and victims. In addition, we find that the evidence was sufficient to establish at least two of the aggravating factors found by the jury; that appellant had a significant history of violent felony convictions involving the use of threat or violence to another person, and that appellant had been convicted of another murder before or at the same time as the instant offense.[16] At the penalty phase, the

---

**15.** Effective June 25, 1997, the General Assembly repealed 42 Pa.C.S. § 9711(3)(h)(iii), pursuant to which this review was required. However, we continue to review for proportionality all cases on direct appeal in which the sentence of death was imposed prior to that date. *See Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997) (Act 28 does not apply retroactively).

**16.** The jury also found the aggravating circumstance that the murder was committed in the perpetration of a felony. 42 Pa.C.S. § 9711(d)(6). The issue of whether this aggravating circumstance is properly applied to accomplices is currently pending before this Court in *Commonwealth*

parties stipulated that appellant had previously been convicted of murder. (N.T. Vol. 9 at 4); *see also Commonwealth v. Rios*, 546 Pa. 271, 291–92, 684 A.2d 1025, 1034–35 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d 1032 (1997)(affirming appellant's prior conviction for first degree murder).

Moreover, in accordance with *Zettlemoyer*, 500 Pa. at 26, 454 A.2d at 942, we must conduct a proportionality review as to appellant's sentence of death. Here, since the jury found three aggravating circumstance and no mitigating circumstances, the jury was statutorily required to recommend a sentence of death. 42 Pa.C.S. § 9711(c)(1)(iv). Further, we have conducted an independent review of similar cases and reviewed the data compiled by the Administrative Office of Pennsylvania Courts in which the sentence of death was made mandatory by the finding of at least one aggravating factor and no mitigating circumstances and conclude that the sentence of death imposed upon appellant is not disproportionate to the sentences imposed in similar cases. *See Commonwealth v. Howard*, 538 Pa. 86, 645 A.2d 1300 (1994); *Commonwealth v. Murphy*, 540 Pa. 318, 657 A.2d 927 (1995); *Commonwealth v. Williams*, 541 Pa. 85, 660 A.2d 1316 (1995), *cert. denied*, 516 U.S. 1051, 116 S.Ct. 717, 133 L.Ed.2d 671 (1996).

Accordingly, we affirm the verdict and the sentence of death imposed upon appellant by the Court of Common Pleas of Philadelphia County.[17]

·*v. Lassiter*, 554 Pa. 586, 722 A.2d 657 (1998). However, because we find support for the jury's findings of at least two aggravating circumstances and no mitigating circumstances, we uphold the sentence of death.

**17.** The Prothonotary of this Court is directed to transmit to the Governor's office the full and complete record of the trial, sentencing hearing, imposition of sentence and review by the Supreme Court pursuant to 42 Pa.C.S. § 9711(i).