J-S08041-24

2024 PA Super 73

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| JOSE M SANTIAGO-BURGOS | : | |
| | : | |
| Appellant | : | No. 573 MDA 2023 |

Appeal from the Judgment of Sentence Entered June 29, 2018
In the Court of Common Pleas of Berks County Criminal Division at
No(s): CP-06-CR-0000886-2016

BEFORE: OLSON, J., MURRAY, J., and STEVENS, P.J.E.[*]

OPINION BY STEVENS, P.J.E.: **FILED APRIL 15, 2024**

Appellant, Jose M Santiago-Burgos, appeals *nunc pro tunc* from the judgment of sentence entered in the Court of Common Pleas of Berks County following his conviction by a jury on three counts of possession with the intent to deliver a controlled substance ("PWID"), 35 P.S. § 780-113(a)(30), and three counts of possession of a controlled substance, 35 P.S. § 780-113(a)(16).[1] After a careful review, we affirm.

The relevant facts and procedural history are as follows: On March 4, 2016, the Commonwealth filed an Information charging Appellant with numerous drug-related offenses, and on May 23, 2018, Appellant, who was

---

[*] Former Justice specially assigned to the Superior Court.

[1] As discussed *infra*, Appellant's direct appeal rights were reinstated via the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-46.

represented by counsel, proceeded to a two-day jury trial. The trial court has aptly summarized the evidence offered at the jury trial as follows:

> [The Commonwealth presented three witnesses, John Fielding, Detective Pasquale Leporace, and Lieutenant Nelson Ortiz. Their testimony established the following:] On January 15, 2016, at approximately 6:35 a.m., a Berks County drug task force executed a search warrant on the residence located at [***] South 18th Street, a three-story row home located in Reading, Berks County, Pennsylvania ("the Residence"). [N.T., 5/23-5/24/28,] at 80-84. The search was related to an ongoing investigation regarding the distribution of illegal narcotics from the Residence and the subjects of the search were Appellant…and another individual—Luis Otero Casiano. [*Id.*] at 82. Upon entry to the Residence, officers found Appellant, his [paramour], and their two children. *Id.* at 83. Luis Otero Casiano was not found at the Residence. *Id.* at 85. After having been advised of his *Miranda*[2] rights, Appellant agreed to speak with detectives, and when asked whether there were drugs, guns, or money in the Residence, Appellant answered in the affirmative. *Id.* at 90. When asked [specifically about] guns or money in the Residence, Appellant told the officers that "he had a little bit of money upstairs." *Id.* at 101.
>
> Appellant then led the officers into the basement of the Residence and, specifically, to a dresser where officers found 490 packets of heroin, a digital scale, and various packaging items. *Id.* at 91-99. In the basement, officers located a small plastic cabinet in which they found a bag containing ammunition and magazines for firearms. *Id.* at 109. In the bottom of the cabinet, [officers] found a Ruger case with a .380 pistol inside of the case. *Id.* It was determined that the boxes of ammunition found were consistent with the firearm located in the plastic cabinet. *Id.* at 110-11.
>
> Officers found a bucket containing a kilo press, which, as testified, is used "when drug dealers dilute their product and they don't want the product to appear to be diluted, so therefore they repress the product in order to make it appear as if it's untouched." *Id.* at 112-13. Large vice grips were also found that would be used in conjunction with the kilo press to apply pressure

---

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

to the press. *Id.* at 114. Officers later found a bag containing benzocaine, which is used as a cutting agent for cocaine, which would be consistent with diluting cocaine with the benzocaine and using the kilo press to repackage the cocaine. *Id.* at 126.

Officers further found a box containing masks, a coffee grinder with heroin residue inside, boxes of blue glassine packets, and rubber bands, both of which are specific to the heroin trade and used in packaging for street level distribution. *Id.* at 116-17. Additionally, officers found a glass mason jar containing rice and a bulk amount of heroin in a plastic bag. *Id.* at 119. Officers likewise located a drill box in the basement in which [they] found ten baggies each containing twenty-eight grams of bulk methamphetamine, consistent with manufacturing for the purpose of distribution. *Id.* at 125.

On a shelf in the hallway leading to the basement, officers found a heat sealer machine, which was consistent with sealing drugs for distribution in the packaging material found in the basement. *Id.* at 103-04. Hanging under the shelf, officers discovered a men's jacket and a backpack, and inside the jacket, officers found a bulk amount of marijuana, which was packaged in one-ounce sized baggies for distribution. *Id.* at 106-07. Officers also found a larger scale for weighing bulkier items. *Id.* at 107-08.

In a room upstairs in the Residence, officers located a teal tub in which they found a .45 caliber handgun with a loaded magazine. *Id.* at 128. The handgun was later determined to be stolen. *Id.* at 129. [In the pockets of a] jean jacket found in a second-floor bedroom, [police found] numerous .45 caliber rounds of ammunition consistent with the handgun found in the tub. *Id.* at 131. Officers located bulk amounts of U.S. currency tucked into a blue purse and in a jacket—both found upstairs at the Residence. *Id.* at 132-35. Some of the currency was bound together into stacks with various names on papers attached to the stacks. *Id.* at 135-36.

On the third floor of the Residence, officers found a small amount of marijuana and a marijuana grinder, along with a pill bottle containing Oxycontin pills. *Id.* at 138-39. Appellant had directed officers to a plastic cabinet where he indicated there was a little money. *Id.* at 139. On top of the cabinet, there was a calculator and a wallet containing Appellant's driver's license and credit cards bearing Appellant's name. *Id.* Inside of the plastic cabinet, officers located a notebook with the same corresponding

names as those earlier discovered on the papers attached to stacks of currency, as well as numeric values consistent with records of sales. *Id.* at 141, 143-44.

***

Appellant presented three witnesses: Bernardo Cartagena, Jacqueline Casiano, and himself. Mr. Cartagena, who is the brother of Appellant's [paramour], testified that he moved to the Reading area from Wisconsin in 2017 and that he works long hours with Appellant in the construction business. *Id.* at 249-52. Ms. Casiano, Appellant's [paramour], testified that she has been with Appellant for eighteen years, and that Appellant worked long hours in construction. *Id.* at 254-55. Ms. Casiano stated that a portion of the money found by law enforcement was actually from a lawsuit that she had settled, and that she had planned to use the money for house repairs, bills, and a trip to Puerto Rico. *Id.* at 257. Ms. Casiano further testified that her son, Luis, along with his three children, came to live with her and Appellant in 2016. *Id.* at 255-56. Ms. Casiano noted that she believed the firearm found in the Residence may have belonged to Luis and that she knew Luis had been drinking a lot. *Id.* at 258-59. Ms. Casiano denied ever seeing Appellant involved in drugs or in the sale or distribution of drugs. *Id.* at 258.

Appellant testified on his own behalf and denied any involvement in the sale or distribution of illegal drugs. *Id.* at 280-81. Appellant further testified that he got [a] tattoo on his chest approximately twenty years before the trial. *Id.* at 282-83. Appellant denied ever telling officers that there were any drugs in the house but indicated that he did tell officers that everything they would find at the Residence belonged to him. *Id.* at 286-87. Appellant stated he believed that Luis was selling drugs. *Id.* at 289. Appellant noted that the money found at the Residence was in part from Ms. Casiano's lawsuit and the rest was from hi[s] construction business. *Id.* On cross-examination, Appellant stated that the tattoo [on his chest] was in reference to his astrological sign of the Libra, and that the money and marijuana [depicted in the tattoo] did not mean anything. *Id.* at 292-93.

Trial Court Opinion, filed 8/28/23, at 1-3, 10-11 (footnote added).

At the conclusion of all evidence, the jury convicted Appellant of the offenses indicated *supra*. On June 29, 2018, Appellant proceeded to a

sentencing hearing, at the conclusion of which the trial court sentenced Appellant to an aggregate of eight and one-half years to seventeen years in prison, to be followed by five years of probation. Appellant did not file post-sentence motions; however, he filed a timely, counseled direct appeal on July 25, 2018. Thereafter, counsel failed to file an appellate brief, and, consequently, by order entered on March 25, 2019, this Court dismissed Appellant's appeal.

On or about October 11, 2019, Appellant filed a timely *pro se* PCRA petition seeking the restoration of his direct appeal rights *nunc pro tunc*. The PCRA court appointed counsel, who filed an amended PCRA petition on February 14, 2023. By order entered on March 20, 2023, the PCRA court reinstated Appellant's direct appeal rights, and on April 17, 2023, this counseled appeal followed. All Pennsylvania Rule of Appellate Procedure 1925 requirements have been met.

On appeal, Appellant sets forth the following issues in his "Statement of Questions Involved" (verbatim):

1. Whether it was error to admit at trial, over defense objection and in violation of Pennsylvania Rule of Evidence 403, photographic evidence of Appellant's large tattoo on his chest which depicts a scale, drugs, and money where:

   a. the probative value was outweighed by the prejudicial effect as the photograph was potentially perceived as Appellant's continued trade in controlled substances and glamorization of selling drugs;

   b. the evidence implied previous involvement in illegal narcotics transactions; and/or,

> > c. no written notice was given pursuant to Pennsylvania Rule of Evidence 403(c)[3] and no motion was filed seeking to admit the photograph as evidence of other acts?
>
> 2. Whether it was error for the prosecutor to twice show to the jury on a large screen monitor Appellant's large tattoo on his chest which depicts a scale, drugs, and money, and to further impermissibly aver to the jury that the tattoo is evidence that Appellant is a longtime, proud drug dealer and was, therefore, a drug dealer in the instant offense?

Appellant's Brief at 5 (suggested answers omitted) (footnote added).

In his first issue, Appellant contends the trial court erred in permitting the Commonwealth to introduce into evidence a photograph, which depicted Appellant's shirtless chest, thus revealing a large, colored tattoo on his chest.[4] It is undisputed Appellant's tattoo depicts a scale with a stack of money on one side and marijuana leaves on the other side.[5] Appellant argues the trial court should have excluded the evidence on the following basis: (1) the probative value of the photograph was outweighed by its prejudicial effect as

---

[3] We note Pa.R.E. 403 has no subsection (c).

[4] The photograph is of Appellant's chest and does not include his head.

[5] We note the trial court included copies of the Commonwealth's exhibits, including the photograph at issue, with the certified paper record. However, the photograph has been reduced to the size of a post-it note, and, due to the low quality of the black and white copy, the tattoo is difficult to make out in the photograph. In any event, Appellant included in his reproduced record a full-size colored copy of the Commonwealth's exhibit, which clearly shows the tattoo at issue. The Commonwealth does not challenge the accuracy of the copy of the photograph provided in Appellant's reproduced record. Thus, for the sake of judicial economy, we shall address Appellant's issue without requiring the trial court to further supplement the certified record.

provided by Pa.R.E. 403; (2) the photograph was improper evidence of Appellant's prior bad acts under Pa.R.E. 404(b); and (3) the Commonwealth failed to give written notice seeking to introduce the evidence.

Initially, we note the following exchange occurred outside the presence of the jury on the first day of trial:

> THE COURT: [Defense counsel,] you made mention of the photographs when we were back in the retiring room. Do you want to raise those issues now? I think I know which ones, but—
>
> ***
>
> [DEFENSE COUNSEL]: So then referring to Commonwealth pre-marked Exhibit C3, C4, and C5. C3 and C4 being a shirtless picture of [Appellant] showing tattoos, which I do not believe they're relevant in this case. Identification is not relevant.
>
> C5, I believe is a picture of [Appellant's paramour], which I don't know why that's relevant. Again, identification is not at issue.
>
> THE COURT: Let me ask [the ADA]. First of all, I note that the woman in the photograph is not charged, nor is she alleged to be a co-conspirator in the case; is that correct?
>
> [ADA]: Correct.
>
> THE COURT: All right. What is the purpose of these three particular exhibits?
>
> [ADA]: Most importantly, there's going to be evidence that when [Appellant] was taken away, he asked for clothing. In fact, his [paramour], the person identified in C5, is the person that retrieved his clothing. It was retrieved from the bin identified as Commonwealth's Exhibit Number 8. The same bin [where] one of the guns was located. It goes to show—
>
> THE COURT: I understand that. But, I don't see—there's a potential prejudicial value of these extensive tattoos, and it seems to be that you have witnesses who are going to testify that this was the state of dress or undress he was in at the time.
>
> [DEFENSE COUNSEL]: 6:30 in the morning.
>
> [ADA]: One of the tattoos, on [Appellant's] right chest area, is relevant. My expert witness, Lieutenant Ortiz, is going to refer—

that's going to be one of his items that also goes into his—partly goes into his—

THE COURT: What tattoo might that be?

[ADA]: It's a tattoo of scales.  One scale has—and I do have the full page.  One scale has a stack of cash, the other scale appears to have a bunch of marijuana.

THE COURT: Well, I note that Commonwealth's Exhibit 4 portrays that particular tattoo as well as another one, but also, maybe more importantly, it does not contain [Appellant's] head.  So, the other one, Commonwealth's Exhibit 3, doesn't even show the tattoo in its entirely.

[ADA]: Right.  I didn't have a photograph that had the entire head or the entire tattoo, so that's why I put in both of them.

THE COURT: Well, what's your—is your argument in favor of Commonwealth's 5 simply that this is a picture of the woman who got the clothing for him?

[DEFENSE COUNSEL]: Just that—

THE COURT: No, that's [a question] for [the ADA].    I'm addressing—

[ADA]: Right.  People that were in the house.  Everybody who was in the house, not law enforcement, were photographed.  Which, you could imply that Luis Otero Casiano was not present.  Which, I think—I don't know what the defense is going to be, but I think they're going to pin these drugs on Luis Otero Casiano.

THE COURT: I understand that. But what do photographs have to do with that?  Your officers are going to testify as to who was there and who was not there.

[ADA]: It just—well, they would have to believe the officers in their entirety, and I hope they do, but—

THE COURT: Well, this is what I'm going to do.  I'm going to allow, over [Appellant's] objection, the use of Commonwealth's 4.  I will not allow the use of Commonwealth's 3 and 5, unless they become more germane due to cross-examination or the testimony of defense witnesses.

[DEFENSE COUNSEL]: Got you, that makes sense.

[ADA]: So, 3 and 4 are—

THE COURT: 3 and 5.

[DEFENSE COUNSEL]: 3 and 5 are out.

- 8 -

With 4, Your Honor, I'm still going to renew my objection there. I understand the tattoo, which half of Facebook has. We don't know what age he was when he got that. Certainly, someone that has a scale with money and marijuana doesn't mean they're a drug dealer.

THE COURT: Well, I don't disagree with that but it's relevant evidence and its probative and you may make those arguments. I don't believe it is unduly prejudicial under the circumstances, so your objection to Commonwealth's 4 is denied.

N.T., 5/23-5/24/18, at 18-22.

Thereafter, during the direct examination of Lieutenant Nelson Ortiz, the Commonwealth showed the lieutenant the photograph of the tattoo on Appellant's chest. *Id.* at 232. The lieutenant testified people often get tattoos of items or other people that are important to them. *Id.* He testified: "So, this tattoo obviously is something that's important to [Appellant]. It's showing that marijuana—in my opinion, it's showing marijuana equals cash." *Id.*

As indicated *supra*, the trial court permitted the Commonwealth to introduce the photograph at issue, marked as Commonwealth's Exhibit 4, on the basis it was relevant, and the probative value outweighed the prejudicial effect. On appeal, Appellant does not dispute the photograph was relevant; however, Appellant contends the trial court abused its discretion in holding the probative value outweighed the prejudicial effect.

The trial court's decision to admit evidence is subject to review for an abuse of discretion. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

- 9 -

*Commonwealth v. Hairston*, 624 Pa. 143, 84 A.3d 657, 664-65 (2014) (citation, quotation marks, and quotation omitted). *See Commonwealth v. Pruitt*, 597 Pa. 307, 951 A.2d 307 (2008) (indicating the appellate courts review a challenge to the trial court's admission of photographs under an abuse of discretion standard).

Pennsylvania Rule of Evidence 402 provides that "[a]ll relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." Pa.R.E. 401. However, "[t]he court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

In the case *sub judice*, the trial court relevantly indicated the following:

> The [trial] court, when presented with [defense] counsel's objection, noted that the photograph of Appellant as shirtless and appearing with his tattoo was relevant and probative. The photograph was relevant both to Appellant's physical state when the officers arrived to execute the search warrant, but also to demonstrate, at least, the personal importance of drugs and money to Appellant. Appellant's physical state at the time of the search led his [paramour] to retrieve clothing from the same plastic bin from which the stolen handgun had earlier been found, demonstrating a connection between Appellant's personal effects and the handgun, and tending to show that Appellant had received and now possessed the stolen handgun. The photograph of Appellant's tattoo was relevant in demonstrating that he valued drugs and money, and the connection between the two, to such

- 10 -

an extent as to have a permanent tattoo placed on his body depicting that relationship. This tended to show that Appellant was involved in the sale or distribution of illegal drugs.

While Appellant argues that "the probative value was outweighed by the prejudicial effects as the photograph was potentially perceived as Appellant's continued trade in controlled substances and glamorization of selling drugs," such an argument can hardly be considered meaningful since any relevant evidence will have the effect of causing the factfinder to infer a connection between the evidence and a defendant's guilt in the crime being charged. Our courts have repeatedly held that "[e]vidence will not be prohibited merely because it is harmful to the defendant." *Commonwealth v. Kouma*, 53 A.3d 760, 770 (Pa.Super. 2012). The prejudice complained of by Appellant provides no basis in itself to exclude the evidence. The very behavior that the Commonwealth was attempting to prove was Appellant's current participation in the drug trade. There was no allegation of Appellant's prior involvement in drug transactions, or that the tattoo was demonstrative of Appellant's prior involvement in drug transactions.

Trial Court Opinion, filed 8/28/23, at 8-9 (some quotation marks and quotations omitted).

We find no abuse of discretion. Appellant contends the introduction of the photograph resulted in "unfair prejudice" because "society has a general disdain for drug dealers." Appellant's Brief at 20. Thus, he suggests the photograph "damned Appellant" for glamorizing drugs. *Id.* However, as the trial court indicated above, "[e]vidence will not be prohibited merely because it is harmful to the defendant." *Commonwealth v. Antidormi*, 84 A.3d 736, 750 (Pa.Super. 2014) (quotation marks and quotation omitted). Trial courts are not required to "sanitize the trial to eliminate all unpleasant facts from the

- 11 -

jury's consideration where those facts are relevant to the issues at hand[.]"

***Commonwealth v. Dillon***, 592 Pa. 351, 925 A.2d 131, 141 (2007).

Further, as the Comment to Pa.R.E. 403 instructs:

"Unfair prejudice" means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially….[E]xclusion is limited to evidence so prejudicial that it would inflame the jury to make a decision based upon something other than the legal propositions relevant to the case.

***Antidormi***, 84 A.3d at 750 (citations, quotation marks, and quotations omitted). Here, the photograph of Appellant's tattoo on his chest, introduced for a legitimate purpose, was not so prejudicial that it likely diverted the jury's attention away from its duty of weighing the evidence impartially or inflamed the jury to make a decision based on "something other than the legal propositions relevant to the case." ***Id.*** Thus, we find Appellant is not entitled to relief.

To the extent Appellant contends the photograph should have been excluded under Pa.R.E. 404(b)(1) as it was indicative of a prior bad act and improperly used by the Commonwealth to show Appellant acted in conformity with the bad act, Appellant has not set forth that place in the record where he objected to the evidence on this basis. Pointing to the discussion on the record set forth *supra*, the trial court indicates Appellant failed to object to the admission of the photograph on this basis. ***See*** Trial Court Opinion, filed 8/28/23, at 9. That is, Appellant confined his objection at trial to whether the photograph was relevant and/or whether the probative value was outweighed

by the prejudicial effect. "The rule is well settled that a party complaining on appeal of the admission of evidence in the [c]ourt below will be confined to the specific objection there made." **Commonwealth v. Cousar**, 593 Pa. 204, 928 A.2d 1025, 1041 (2007) (quotation marks and quotations omitted). Thus, we decline to address this challenge further.

Similarly, regarding Appellant's contention the trial court should have excluded the photograph on the basis the Commonwealth failed to give Appellant pre-trial written notice that it was planning to introduce the evidence, Appellant has failed to set forth that place in the record where he objected on this basis. The trial court notes in its Pa.R.A.P. 1925(a) opinion that Appellant did not raise an objection to the admission of the photograph on this basis during trial. **See** Trial Court Opinion, filed 8/28/23, at 9. Thus, this issue is waived. **Cousar**, **supra**.

In any event, we note that, assuming, *arguendo*, Appellant preserved his issues, and the trial court should have precluded the evidence and/or testimony related to the photograph as alleged by Appellant, any error with regard thereto is harmless.[6]

---

[6] We note our Supreme Court has held that this Court may *sua sponte* invoke the harmless error doctrine since it "does nothing more than affirm a valid judgment of sentence on an alternative basis." **Commonwealth v. Hamlett**, 660 Pa. 379, 234 A.3d 486, 492 (2020) (quotation marks and quotation omitted). In any event, the Commonwealth, as well as the trial court, indicate any error in the admittance of the photograph was harmless error.

The harmless error doctrine reflects the reality that the accused is entitled to a fair trial, not a perfect trial. [The Supreme Court has] described the proper analysis as follows:

Harmless error exists if the record demonstrates either: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; or (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hairston*, 624 Pa. 143, 84 A.3d 657, 671 (2014) (quotation marks and quotations omitted).

Relevantly, in analyzing the harmless error doctrine, the trial court indicated the following:

Instantly, the Commonwealth presented three witnesses at the trial. First, John Fielding, the owner of the stolen firearm, testified to his ownership of the stolen firearm and the circumstances of its theft. Next, Detective Pasquale Leporace testified about the investigation and executed the search of the Residence, detailing the discovery of all the previously cited items retained and presented as evidence at trial. Finally, Lieutenant Nelson Ortiz, who was qualified as an expert in the trafficking of narcotics, testified as to the items that were discovered through the search of the Residence and how those items are utilized in the sale and distribution of illegal drugs. Lieutenant Ortiz likewise testified as to the behavior and common habits of those involved in the drug trade.

\*\*\*

Given the detailed evidence presented by the Commonwealth, including photographs of all items found during the search, and the expert opinion analysis provided by Lieutenant Ortiz, it is clear that the other properly admitted evidence demonstrated [Appellant's guilt] overwhelmingly. It is difficult to

- 14 -

imagine that the minimal prejudicial effect of the photograph of the tattoo contributed in any meaningful manner to the verdict of the jury.

Trial Court Opinion, filed 8/28/23, at 10-11 (citations to record omitted).

We agree with the trial court's analysis. Here, the Commonwealth established at length, and its witnesses described in detail, the controlled substances, guns, and cash found throughout the Residence. The Commonwealth also established the police discovered several items, which are commonly used in the drug distribution business, in the Residence. Further, not only was Appellant discovered in the Residence during the early morning hours when the police executed the search warrant, but a wallet containing his driver's license and credit cards was discovered in the Residence. Accordingly, given that the uncontradicted evidence of guilt was so overwhelming, the prejudicial effect from the evidence and testimony related to the photograph of Appellant's tattoo was so insignificant by comparison that any error in the admittance of the photograph could not have contributed to the verdict. **Hairston**, **supra**. Thus, Appellant is not entitled to relief.

In his second issue, Appellant challenges the Commonwealth's closing statement to the jury.[7] Specifically, Appellant contends:

---

[7] In the argument portion related to his second issue, Appellant also makes a passing reference to the Commonwealth presenting the photograph of Appellant's tattoo during the Commonwealth's case-in-chief via a large screen. *(Footnote Continued Next Page)*

During the trial, [the ADA] exceeded what was proper in a District Attorney's presentation to the jury. In his closing argument, [the ADA] gave his personal opinion to the jury that Appellant was a longtime drug dealer and was therefore a drug dealer on this occasion as well. Appellant argues that this was highly inflammatory and also a statement of personal opinion. District Attorneys are well regarded by the public, and they have a duty to act within the confines of the law. The case law is very clear that a District Attorney cannot act in an inflammatory manner, and the District Attorney cannot give their personal opinion at any time in the trial.

Appellant's Brief at 24.

Specifically, Appellant challenges the following bolded portions of the

ADA's closing argument:

**[Appellant] branded himself as a drug dealer. (Indicating). Drugs equals money. That's forever branded on his body. That's who he is. He's a drug dealer. How do we know that? Because the evidence tells you. [Appellant] told you though his tattoo.**

I'm not going to show you every single photograph. There are almost a hundred of them. I'm not going to show you every single piece of evidence because you already saw it. I don't want to waste your time.

How do we know that [Appellant] is a drug dealer? He told Detective Leporace. He came into the house on January 15th of 2016 and was asked, "Do you have any drugs, guns or money in

_____

*See* Appellant's Brief at 27. Appellant contends the presentation of the photograph in this manner was "likely offensive." *Id.* Appellant has not set forth where in the record he objected to the photograph being displayed on the large screen monitor. In any event, as discussed *supra*, given the overwhelming evidence of Appellant's guilt, we conclude any error in the trial court allowing the jury to view the photograph on a large screen monitor is harmless error. *See Hairston*, *supra*, 84 A.3d at 671 (holding error is harmless where "the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict") (quotation marks and quotation omitted)).

- 16 -

the house?" Detective Leporace told you that he said, "My drugs are downstairs."

\*\*\*

**So, I'm not going to go into any further detail, but I'll just ask you, is there any explanation about where the money came from or where the money got to? Does that make sense? Does his explanation about his tattoo make sense that it was just a nice design? He liked the design, therefore he put it [*sic*].** You have to determine whether [Appellant] lied to you, whether [Appellant's paramour] lied to you. And if you believe that they lied to you, you can disregard their entire testimony.

This has been a long case. From January of 2016 until now, almost two and a half years. [Appellant] ever since the first day has been cloaked—has been covered in the cloak of innocence. To this day he still wears that cloak. But you can change that. You have the power to change that. You can tell him that what he did was wrong.

Appellant's Brief at 25 (citing N.T., 5/23-5/24/18, at 323, 329) (bold added).[8]

The trial court concluded the ADA did not commit misconduct. Trial Court Opinion, filed 8/28/23, at 11-12. Assuming, *arguendo*, Appellant has preserved his claim of prosecutorial misconduct, we find no relief is due.[9]

---

[8] We note the trial transcript from May 23 and 24, 2018, is included in the certified record; however, pages 328 to 331 have apparently been inadvertently omitted from the certified transcript. In any event, Appellant included in his reproduced record an excerpt of the transcript, including page 329, which is related to his second appellate issue. The Commonwealth does not challenge the accuracy of the excerpt included in Appellant's reproduced record. Thus, for the sake of judicial economy, we shall address Appellant's issue without requiring the trial court to further supplement the certified record.

[9] The Commonwealth suggests Appellant did not object to the challenged portions of the ADA's closing argument, and, therefore, his issue is waived. *(Footnote Continued Next Page)*

With specific reference to a claim of prosecutorial misconduct in a closing statement, it is well settled that "[i]n reviewing prosecutorial remarks to determine their prejudicial quality, comments cannot be viewed in isolation but, rather, must be considered in the context in which they were made." ***Commonwealth v. Sampson***, 900 A.2d 887, 890 (Pa.Super. 2006) (citation omitted). Our review of prosecutorial remarks and an allegation of prosecutorial misconduct requires us to evaluate whether a defendant received a fair trial, not a perfect trial. ***Commonwealth v. Rios***, 554 Pa. 419, 721 A.2d 1049, 1054 (1998).

\*\*\*

It is well settled that a prosecutor has considerable latitude during closing arguments and his arguments are fair if they are supported by the evidence or use inferences that can reasonably be derived from the evidence. Further, prosecutorial misconduct does not take place unless the unavoidable effect of the comments at issue was to prejudice the jurors by forming in their minds a fixed bias and hostility toward the defendant, thus impeding their ability to weigh the evidence objectively and render a true verdict. Prosecutorial misconduct is evaluated under a harmless error standard.

***Commonwealth v. Holley***, 945 A.2d 241, 250 (Pa.Super.2008) (internal citations and quotations omitted). We are further mindful of the following:

In determining whether the prosecutor engaged in misconduct, we must keep in mind that comments made by a prosecutor must be examined within the context of defense counsel's conduct. It is well settled that the prosecutor may fairly respond to points made in the defense closing. Moreover, prosecutorial misconduct will not be found where comments were based on the evidence or proper inferences therefrom or were only oratorical flair.

\*\*\*

It is settled that it is improper for a prosecutor to express a personal belief as to the credibility of the defendant or other

_____

However, given the certified record is missing pages from the ADA's closing argument (and some of those pages are also absent from Appellant's reproduced record), we are unable to confirm whether Appellant did or did not object. Accordingly, we decline to find waiver under these particular circumstances.

witnesses. However, the prosecutor may comment on the credibility of witnesses. Further, a prosecutor is allowed to respond to defense arguments with logical force and vigor. If defense counsel has attacked the credibility of witnesses in closing, the prosecutor may present argument addressing the witnesses' credibility.

*Commonwealth v. Judy*, 978 A.2d 1015, 1019 (Pa.Super. 2009) (citation omitted). Thus, proper examination of the comments of the ADA in closing requires review of the arguments advanced by defense counsel in the defense summation. *Id.*

Here, during his closing statement, defense counsel indicated Appellant, who testified during trial, "spoke the truth." N.T., 5/23-5/24/18, at 316. Defense counsel argued the drugs found in the Residence belonged to Luis Otero Casiano, who is the son of Appellant's long-time paramour. *Id.* at 317. He averred that, if the police had tested the fingerprints, they would have discovered that fingerprints on various items belonged to Mr. Casiano. *Id.* Defense counsel argued the reason the police did not test the fingerprints was because "[t]hey know whose fingerprints are on this." *Id.*

Defense counsel also suggested the police should have conducted a more thorough investigation, including stopping people who came in and out of the Residence. *Id.* at 320-21. Defense counsel indicated that, if the police had done so, they would have discovered people were buying drugs from Mr. Casiano. *Id.* at 321. Defense counsel specifically argued Appellant was not involved with the drugs. *Id.* at 318. Defense counsel suggested he had to make "difficult decisions" on how to defend Appellant because Appellant

wanted to protect family and friends who were actually involved in the drug trafficking. *Id.* at 314.

In response, as indicated *supra*, the ADA argued in his closing that the evidence, including Appellant's tattoo, reveals that Appellant was the person dealing the drugs seized from the Residence. *Id.* at 323. When read in context, the comments of the ADA represented a fair response to defense counsel's contention that Appellant was not involved with the dealing of drugs, and it did nothing more than focus the attention of the jury on the evidence that was presented by the Commonwealth. *See Judy*, *supra*. Contrary to Appellant's assertion, the ADA's comments were not improper personal opinions. *See id.*

Moreover, regarding the ADA's comments asking the jury to consider whether Appellant's explanations about the money and tattoo make sense, we disagree with Appellant that the ADA improperly asserted a personal opinion regarding the credibility of Appellant's explanation. When read in context, the ADA specifically informed the jury that the jury needed to determine whether to believe Appellant and/or his paramour. N.T., 5/23/-5/24/18, at 329. The ADA specifically advised the jury that Appellant was presumed innocent, and it was up to the jury to decide whether Appellant was telling the truth. *Id.* In a case such as this where the outcome is controlled by credibility determinations, an ADA "is permitted to make comments reinforcing the fact that the jury is presented with conflicting accounts." *Judy*, 978 A.2d at 1024

(citation omitted). Accordingly, Appellant is not entitled to relief on his claim of prosecutorial misconduct.

For all of the aforementioned reasons, we affirm.

Affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/15/2024